LESSEE OF JOSEPH MARLATT, PLAINTIFF IN ERROR, v. JOHN SILK, AND JOHN M'DONALD.

Ejectment. A tract of land situated in that part of the state of Pennsylvania, which, by the compact with the state of Virginia, of 1780, was acknowledged to be within the former state, was held under the provisions of an act of assembly of Virginia, passed in 1779, by which actual bona fide settlers, prior to 1778, were declared to be entitled to the land on which the settlement was made, not exceeding four hundred acres. The settlement was made in 1772. Of this tract, in the year 1786, a survey was made, and returned into the land office of Pennsylvania, and a patent was granted for the same. The title set up by the defendants in the eject- ment was derived from two land warrants from the land office of Pennsylvania, dated in 1773, under which surveys were made in 1778, and on which patents were issued on the 9th of March, 1782. The compact confirms private property and rights existing previous to its date, under and founded on, and recognised by the laws of either state, falling within the other; preference being given to the elder or prior right: subject to the payment of the purchase money required by the laws of the state in which they might be, for such lands. HELD: that the title derived under the Virginia law of 1779, and afterwards perfected by the patent from Pennsylvania, in 1788, was a valid title, and superior to that asserted under the warrants of 1773, and the patent founded on them, and issued in 1782.

VOL. XI.—A

[Marlatt v. Silk.]

The title derived under the act of the legislature of Virginia, of 1779, commenced in 1772 when the settlement was made; and therefore stands as a right, prior in its commencement to that originating under the warrants of 1773. The question of title between the contending parties is not to be decided by the laws or decisions of either Pennsylvania or Virginia, but by the compact of 1780.

The principles on which the case of Jackson v. Chew, 12 Wheat. 163, are decided, are not affected by the decisions of the court in this case. In the case of Jackson v. Chew, the court said that it adopted the state decisions, when applicable to the title of lands. That was in a case the decision of which depended on the laws of the state, and on their construction by the tribunals of the state. In the case at bar, the question arises under, and is to be decided by a compact between two states, where the rule of decision is not to be collected from the decisions of either state, but is one of an international character.

IN error to the district court of the United States for the western district of Pennsylvania.

The plaintiff in error, a citizen of the state of Ohio, instituted an action of ejectment against the defendants, at October term, 1831, to recover a tract of land situated in Alleghany county, Pennsylvania; and the case was tried before the district court for the western district of Pennsylvania, in October, 1835. A verdict and judgment, under the charge of the court, were rendered in favour of the defendants, and the plaintiff having taken exceptions to the charge, prosecuted this writ of error.

The case, as stated, in the opinion of this Court was as follows:—
Thomas Watson, under whom the plaintiff in error claims, on the 25th of April, 1780, obtained from certain commissioners of Virginia, a certificate, entitling him to four hundred acres of land, by virtue of an act of assembly of Virginia, passed in May, 1779; the fourth section of which, after reciting that great numbers of people had settled in the country upon the western waters, upon waste and unappropriated land, for which they have been hitherto prevented from suing out patents, or obtaining legal titles, &c., enacts, "that all persons who at any time before the first day of January, in the year one thousand seven hundred and seventy-eight, have really and bona fide settled themselves or their families, or at his or her or their charge, have settled others upon any waste or unappropriated lands on the said western waters, to which no other person hath any legal right or claim, shall be allowed for every family four hundred acres of land, or such smaller quantity as the party chooses to include in such settlement." This certificate was granted in right of a settle-

[Marlatt v. Silk.]

ment which had been made by Watson, in the year one thousand seven hundred and seventy-two. This evidence of right under Virginia, was subsequently transferred to the land office of Pennsylvania, (the land having, under a compact between that state and Virginia, been ascertained to be within the limits of Pennsylvania) and on the first of November, 1786, a survey of his claim was made and returned to the land office of that state, and a patent issued thereon by that state, in the year seventeen hundred and ninety-one, including the settlement made in 1772, and including the land in controversy. The defendants claim under Edward Hand, who, by virtue of two land warrants granted by Pennsylvania, one for three hundred acres, dated 24th November, 1773, the other for the same quantity, dated 27th November, 1773, caused surveys to be made on both on the 21st January, 1778, and on the 9th of March, 1782, obtained patents on both surveys, embracing the land in controversy.

Both Pennsylvania and Virginia having claimed the territory, of which the land in controversy is a part, as being within their limits. The dispute was finally adjusted by a compact made between them, which was ratified by Virginia on the 23d of June, 1780, with certain conditions annexed; and absolutely by Pennsylvania, on the 23d of September, 1780, with an acceptance of the conditions annexed by Virginia.

The compact declares; "That the private property and rights of all persons acquired under, founded on, or recognised by the laws of either country, previous to the date hereof, shall be secured and confirmed to them, although they should be found to fall within the other; and that in disputes thereon, preference shall be given to the elder or prior right, whichever of the said states the same shall have been acquired under; such persons paying to the said states, in whose boundary the same shall be included, the same purchase or consideration money, which would have been due from them to the state under which they claimed the right."

The case was presented to the court in printed arguments, by Mr. Forward and Mr. Fetterman for the plaintiff in error: and by Mr. Ross for the defendants.

It was contended for the plaintiff that, in the construction given, the district court had erred.

The rights of the parties to this cause will turn upon the construction that may be given to the compact for the settlement of

boundaries, entered into between Virginia and Pennsylvania, in the year 1780, and finally ratified in 1784. Smith's edition of the laws of Pennsylvania, 2d vol. 261. Sims' lessee v. Irvine, 3d Dall. Rep. 426. " It was a condition of the compact, that the *private property and rights of all persons acquired under, founded on, or recognised by the laws of either country previous to the date hereof, be secured and confirmed* to them, although they should be found to fall within the other, and *that in disputes thereon, preference shall be given to the elder or prior right,* whichever of the said states the same shall have been acquired under; such persons paying to the states, within whose boundary their lands shall be included, the same purchase or consideration money, which would have been due from them to the state under which they claimed the right." Thomas Watson in 1772, entered with his family on a tract of vacant land, of which the land in dispute is a part. He continued to reside on and cultivate the tract until his death in 1806. He sold from time to time parcels of this land; and in the year 1790, transferred and conveyed part of the tract, including his mansion house and improvements.

At the same time he removed to the piece now in dispute, where he built a house, commenced a new clearing, and resided until his death. His heirs, and those claiming under them, continued the possession until expelled by the sheriff under a writ of *habere facias possessionem,* issued in 1830, pursuant to a judgment obtained in the case of Brien et al. v. Elliot and others, reported in 2 Penn. Reports, page 49. Whether Watson entered on the lands originally as a Virginia settler, does not appear. But the land commissioners of that state being in his neighbourhood, he appeared before them on the 25th of April, 1780, and caused his claim to be entered agreeably to the requisitions of an act of assembly of Virginia, passed in May, 1779, Sec. 8. 10. Henning's Statutes at Large, p. 42, 43, 45, 46. After the ratification of the compact in 1784, his Virginia entry was transferred to the land office of Pennsylvania; and on the 1st of November, 1786, a survey of his claim was made, returned and accepted in the land office, and a patent issued in 1791. The amount of purchase money paid by Watson to the state of Pennsylvania, was the same that he would have paid to the state of Virginia, had his title been completed in that state. The defendant gave in evidence three Virginia entries, dated in February, 1780. Upon these entries no surveys had ever been made, nor had the inceptive equity,

[Marlatt v. Silk.]

which they are alleged to have conferred, been prosecuted in any
way by the owners or holders thereof.   It was not shown that those
entries described or called for the land in dispute; nor did it appear
in evidence, that the improvement, which by the law of Virginia
was made the basis of a Virginia entry, had ever been made.   Hav-
ing no legal foundation, and being moreover *abandoned;* the defen-
dant's Virginia entries are regarded as mere nullities, and unde-
serving of farther notice.   The defendants' title rests upon warrants
issued by the land office of Pennsylvania, on the 24th of November,
1773, surveyed in January, 1778, and patented the 9th of March,
1782; and the important question is this, whether, under the com-
pact between Pennsylvania and Virginia, his title is to be preferred
to that of Watson, which, although perfected by a patent from the
government of Pennsylvania, was, in its inceptive state, recognised
by the state of Virginia.   It is admitted by the court below, that if
Watson had waved his Virginia entry, and prosecuted his earlier
settlement right under Pennsylvania, there could be no doubt of the
plaintiff's right to recover.   "Watson had it in his power to obtain
a warrant from Pennsylvania, and to charge himself with interest
from the date of his settlement: if he had done so, his survey made
under such warrant would have given him the preference; but
having his election, he chose to resort to a Virginia entry in 1780,
thereby asserting a different jurisdiction, &c."   A like concession is
found in the opinion of the chief justice of the supreme court of
Pennsylvania.   "As an improver under Pennsylvania, Watson might
have appropriated the land in dispute, by a survey in a reasonable
time."   This improvement was begun in the year 1760, [1772] "but
*as a Pennsylvania settler* he had no survey at all," 2 *Penn. Rep.* 60.
It is proper to remark here, that in Pennsylvania, a right founded
on a prior actual settlement which has not been abandoned, is just
as valid in law as a right vested by a prior warrant or patent.
"Title by settlement and improvement, is now as well established
as any species of title in Pennsylvania; and very often has been pre-
ferred to warrant, survey and patent."   Less. of Bonnet v. Dem-
baugh et al. 3 Binney Rep. 175.   Nicholas v. Lafferty, 3 Yeates,
272.   Lessee of Elliott v. Bonnet, 3 Yeates, 287.

   It is not even necessary to the validity of a settlement right, so
long as the settler remains in actual possession, that his boundaries
be defined by an official survey; and if encroached upon or expel-
led from his possession, he may recover in ejectment.   Davis v.

[Marlatt v. Silk.]

Keeper, 4 Bin. 161, and Gilday v. Watson, 2 S. & R. 410. The only difficulty is, that without a survey, the claim of the settler is so indefinite, that an action cannot be supported by reason of the uncertainty of the land to be recovered: but in the first place, it cannot be denied that the land on which a man has built a house, and that also which has been cultivated and enclosed by him, may be ascertained with absolute certainty. Neither do we think it can be denied, that in the case now under consideration, the claim of the settler may be reduced to certainty, because it is bounded by the lines of adjoining surveys. So likewise may a claim by a settlement be precisely ascertained, when the settler has defined his limits by an *unofficial survey* marked on the ground, and made known to the neighbourhood: Chief J. Tilghman in Luck et al v. Duff, 6 Sergeant & Rawle, 19%. The holder of a later warrant is not permitted to encroach upon a prior settler, and cut off land adjacent to his improvement; under the pretext that there is surplus land, and that the settler can fill his claim in another direction. Such encroachment was held unlawful, although made in 1814, upon a settlement which commenced in 1775, and upon which no legal survey had ever been made: Blair v. M'Kee, 6 Sergeant & Rawle, 193: and the same principle is recognised in Breck et al. v. Moon et al. 7 Sergeant & Rawle, 330, 335.

These cases show how settlement rights have been appreciated in Pennsylvania. They demonstrate not only that Watson, by waving his Virginia entry, and obtaining a warrant and patent under Pennsylvania, might have held the lands against the patents of the defendants, but that by waving his Virginia entry, he might have held it under his actual settlement alone. Had a controversy arisen in a Pennsylvania court, between Watson and Hand, prior to the ratification of the compact in 1784, Watson's settlement right would have been adjudged, without hesitation, to be valid; and Hand's title would have been treated as a nullity. The fact, if true, that Watson originally settled under what he supposed to be the rightful jurisdiction of Virginia, or that he had acknowledged her jurisdiction by appearing before her land commissioners, and procuring an entry of his land, would not have impaired, or in the least affected the merits of his settlement title. Pennsylvania always favoured and encouraged actual settlements, and they were sanctioned and held sacred, without any inquiry as to the opinion which the settlers might have entertained upon the abstruse and doubtful ques-

[Marlatt v. Silk.]

tion of state jurisdiction. Had Pennsylvania receded from the contest, and yielded to Virginia without any compact the territory which included the land in dispute, Watson's title would have been unquestionable. For although it may be true, that before the passage of the Virginia act of May, 1779, the land in dispute might have been entered and patented under that state by any person, notwithstanding a prior settlement by another; and although the same act of assembly of 1779 may "apply only to controversies between mere settlers;" yet the fourth section of that act enacts, "that all persons who at any time before the first day of January, 1778, have really and bona fide settled themselves and their families upon any waste lands on the said western waters, to which no other person hath any legal right, a claim shall be allowed for every family so settled, of 400 acres of land:" and as Watson had really and *bona fide* settled himself with his family on the lands in dispute, in 1772; was residing on it as a *bona fide* settler in January, 1778, and May, 1779, he was therefore entitled, as a settler, to the protection of the act, until a superior title by settlement, warrant or patent, *under Virginia*, should appear against him. No such superior title has been shown to have existed in General Hand; and as against him, Watson's title, in a Virginia court, would have been valid and undeniable. How then does it happen, that this title, which in the absence of the compact would have prevailed without difficulty in the courts of either state, is *under* and by *the compact* rendered worthless? The reason assigned by the court below for this strange result is, that Watson, instead of obtaining a warrant from Pennsylvania, has lost his preference by resorting to his Virginia entry, and thereby asserting a different jurisdiction.

Had the compact been less careful in saving and preserving the rights of property originating under the respective governments than we find it to be; had the claimants under Virginia been thrown upon the courtesy or compassion of Pennsylvania without a guaranty or stipulation in their behalf; it might be very properly urged, that a party who persisted in holding on to his bad title, because it was the cheapest, should not have the benefit of a good one which he had thereby repudiated. But the compact is not silent on the subject of Virginia claimants. Their rights are anxiously guarded by clauses which would seem to exclude the possibility of their being either postponed or frittered away by any effort of construction. "The private property and rights of all persons acquired under or recog-

nised by the laws of either country, are saved and confirmed to them, *although* they *should fall within the other;* and preference shall be given to the elder or *prior* right, whichever of the said states the same shall have been acquired under, such person paying the same purchase money which would have been due to the state under which they claimed the right." The reasoning of the court below is repugnant, not only to the sense and spirit of the above provision in the compact, but is flatly opposed to its words. If Watson could not, without *disadvantage or peril*, obtain a patent upon his settlement and Virginia entry, on paying the price originally due to Virginia; then the stipulation which proposed to set forth the terms upon which all his rights should be saved, was a mere decoy or trap. The injustice of this exposition is not limited to settlers under Virginia; it would be equally fatal to the claim founded upon warrants and surveys under that state. The rights to perfect such title by a patent from Pennsylvania, on payment of the *Virginia price* of the land, if not already paid; rests upon a footing neither broader nor more safe, than that of the settler with a Virginia entry.

The rights of both are secured by the same words; and if the non-payment of *the Pennsylvania* price of the land, with *interest* from the origin of the title, is a fatal delinquency in the one case, it must be equally so in the other; and the consequence must necessarily be, that the holder of a Virginia title, of *any description*, which has been completed by a patent from *Pennsylvania*, on paying the same purchase or consideration money, which would have been due from him to Virginia, must fail in a conflict with a Pennsylvania title; although the Pennsylvania title be not the elder or prior right. These considerations show that the construction given to the compact, by the court below, is hostile to its terms; and would be, if carried out in practice, disreputable to Pennsylvania. The titles of Watson and Hand constituted one of the subjects of controversy, in the case of Brien and Wife v. Elliot and others, reported in 2d Penn. Rep. 49. In that case the court was equally divided: and the opinion which appears in the printed report would not, aside of its intrinsic merits, be entitled to any weight in an inferior court of the state in which it was pronounced: much less will it be regarded here as conveying the views of the supreme court of Pennsylvania upon the question under consideration, as under the law of Pennsylvania one verdict and judgment are not conclusive: and it is perhaps due

[Marlatt v. Silk.]

to the learned Chief Justice to remark, in conclusion, that his opinion may have been influenced by an unfortunate misconception of the facts of the case. He supposed the title of Hand to have originated in a location bearing date the 3d April, 1769, three years *before* the settlement of Watson. But the commencement of Hand's title was the warrant of 1773 above referred to. No location was given in evidence by either party applicable to this land. But even if it were so regarded, the construction given by that court, to the compact with Virginia, although regarded with all proper deference, would not be adopted by this court as a matter of course. The possibility if not the certainty of a different and opposite construction, prevailing in the courts of Virginia, makes it both proper and necessary, that the true meaning of the compact should be sought for and declared by this court, unfettered by the opinions of others. It is found in its terms, to recognise and save every description of right. The high contracting parties designed that the benefits secured by it to the claimants under both governments, should be *equal* and *reciprocal;* and that their titles should have, respectively, all the advantage and efficacy, that could be derived under the laws of either. This is so plain as never to have been questioned or doubted, in any case arising under the compact. In the case of Brien et al. v. Elliot, 2 Penn. R. 60, 61, it is premised as the basis of the argument of Chief Justice Gibson, an argument which conducted him to a conclusion directly opposite to the premises from which it was drawn. His language is as follows: "Whatever may have been the case originally, the titles of both 'states' were, as regards the question of priority put by the compact, exactly on a footing, and are by a fair construction to be treated as if they had always been so. Unless they were considered to have been in relation to each other, valid coexistent rights from the beginning, as far as regards jurisdiction, how could there be any comparison as to dates?"

The very basis of the compact is an admission that the jurisdiction shall be taken to have been in common, and that claimants under the one state shall be entitled to the same protection against claimants under the other, "that they would be entitled to between themselves." Upon this construction of the compact, it would seem necessarily to follow, that Watson in a contest with Hand, who claimed under Pennsylvania warrants, would be entitled to all the advantages of a Pennsylvania settler, and must of course prevail. But this natural inference was rejected by the learned Chief Justice;

Vol. XI.—B

and instead of allowing to Watson's improvement the merit to which, under his own proposition it was entitled, he treats it as a mere Virginia settlement, giving no colour of title till 1779; and then, by transmuting Hand's Pennsylvania warrants, into Virginia warrants, he discovers that they are the "elder or prior title." With all possible respect for the learned Chief Justice, we must be allowed to say, that in this instance, the use made of his own construction of the compact is most inapt and injurious. It is not true that as against Pennsylvania warrants, Watson had no colour of title prior to 1779; as against those warrants, his title under the laws of Virginia, was valid from the date of his settlement. But the learned judge supposed that by the compact, Hand's Pennsylvania warrants were converted into Virginia warrants; and that the rule applied in the case of Jones v. Williams, 1 Wash. Rep. 231, which was a conflict between Virginia claimants, unaffected by the compact, was decisive of the present case. We contend, however, that if under the compact a Pennsylvania warrant is clothed with the merit and efficacy of a Virginia warrant, a *Virginia* settlement is also invested with all the attributes and advantages of a *Pennsylvania* settlement. This is not only the clear import of the compact, but it is adopted by the learned Chief Justice himself; and it is only by denying to his *own rule,* the reciprocity secured by the compact, and dictated by every principle of reason and equity, that Watson's title can be rendered doubtful.

The learned Chief Justice says, that Virginia "having recognised the grants of another state as being equally valid as her own, it is fair to say she recognised them as being attended with all the incidents of her own, against which, it appears by her own court, the doctrine of priority by relation never prevailed." This reasoning of the learned Chief Justice may be very pertinent and true, but if it be so, then it must follow; that Pennsylvania also having recognised the rights of all persons acquired under, founded on, or recognised by the laws of Virginia, as *being equally valid as her own;* it is fair to say, she recognised them as being attended with all the incidents of her own: consequently, that Watson's settlement is, in the compact, recognised by her, as equally valid as a Pennsylvania settlement. This is plain reasoning, and a fair exposition of the compact. The error of the learned judge is in applying it to the claims originating under Pennsylvania, while he denies its application to claims originating under Virginia.

[Marlatt v. Silk.]

Keeping in view the application of the compact, as made by the learned judge, to the case of a Pennsylvania warrant in conflict with a Virginia settlement, it may be inquired, What would be the fate of a Virginia warrant dated in 1773, in conflict with a Pennsylvania settlement originating in 1772? The reasoning of the learned judge requires the postponement of the Virginia title in this case also; and thus, while a Pennsylvania warrant is made to prevail against a prior Virginia settlement, a Pennsylvania settlement will prevail against a Virginia warrant. Further, it has been shown that such settlement is by the laws of Pennsylvania a perfectly valid title from its commencement, and cannot be over-reached or affected by a later warrant and survey and patent. Such being the case, the argument of the learned judge would give to a settler under Pennsylvania, who may have entered in that character upon Watson's tract in 1778, an older and better title than Watson's; and had such settler been removed by an action of ejectment at the suit of Watson *before* the compact, he (like a Pennsylvania warrantee or patentee, removed in the same manner) might, *after* the compact, have re-entered upon Watson and turned him out by action of ejectment. Proving thereby, that the law and the rights of the parties were one way *before* the compact, and another way *after* the compact. · The learned Chief Justice appears to have foreseen this result of his reasoning, and he has accordingly provided for it by asserting (2 Penn. R. 61) that " the power of the two states to regulate questions of title to the soil even at the expense of rights previously vested under either, is not now to be questioned   The compact is necessarily founded on an assumption of it.   Here was no constitutional limitation on either side, and the parties acting in the capacity of *sovereigns,* were fettered by no rule but their sense of expediency and justice. The consideration was the compromise of an international dispute; and the individuals whose titles were jeoparded, had no right to call on the state under which they held, to assert their rights to the soil." This is dealing very plainly with the compact, and with titles claiming its protection. The fact that Watson had a vested right prior to the date of the compact, which might have been maintained under either government against the warrants and surveys of Hand, has been clearly demonstrated; and the fact, that by the judgment of the supreme court of Pennsylvania, the compact which expressly guarantied his right, has been made the instrument of its destruction, is equally certain. A latent intention which the compact expressly

repels by the declaration of a *contrary* intention, is finally imputed
to it: and as Virginia had the power of annihilating the vested rights
of claimants to whom her faith was pledged, it is insinuated that
she has actually done it.  If such be not the meaning of the learned
judge, then his language is inapplicable and out of place.  We insist
that this implied imputation upon the faith and honour of Virginia,
rests on nothing better than mere assumption; that it is disclaimed by
her in express terms, and repudiated by the confirming act of Penn-
sylvania, cited by the learned judge, in support of his opinion re-
ferred to.  "Although the conditions annexed by the legislature of
Virginia to the ratification of the boundary line agreed to by the
commissioners of Pennsylvania, Virginia, and Maryland, may seem
to countenance-some unwarrantable claim which may be made under
Virginia in consequence of pretended purchases or settlements pend-
ing the controversy; yet this state does agree to the condition pro-
posed by the state of Virginia," &c.   3d Dallas' Reports, 426, Sims'
lessee v. Irvine.   Such was the understanding of the legislature of
Pennsylvania; and like every other document emanating from the
government of either state, respecting their controversy about limits,
their desire to save and protect every description of private right, is
a fact beyond cavil; and when it is recollected that neither state *pro-
posed* to compromise or touch any rights of soil previously vested in
individuals; that the controversy was carefully restricted to the ad-
justment of boundaries, and that it terminated in an explicit, record-
ed *disclaimer* of any purpose to *unsettle* or jeopard private rights;
a construction of the compact which displaces a pre-existing valid
title, by one that is proved to have been comparatively worthless, is ·
a violation of its terms, and a palpable breach of the public faith.
The learned Chief Justice remarks, 2 Penn. R. 62, that the confirming
act of Pennsylvania was doubtless an agreement to close with Vir-
ginia on her own terms, and to encounter the danger of fraud and
imposition of surreptitious titles which these terms rendered more
imminent; not to waive all scrutiny and submit to fraud and imposi-
tion when it might be detected.

   If, by this language, a suggestion is intended to be conveyed, that
Watson's title is liable to the imputation of fraud, or that the case
before the supreme court of Pennsylvania involved any question
as to his Virginia entry having been fraudulently obtained; then the
case was totally misconceived by the learned Chief Justice.   For it
was neither proved nor pretended that Watson's title was surrepti-

[Marlatt v. Silk.]

tious or fraudulent. If the learned Chief Justice intended to express a truism which no one ever disputed, and to take the risk of its being adopted by others, as a proper and the only basis of his conclusion; then his language was inapplicable to the case.

The cases of Smith v. Brown, 1 Yeates, 516, and Hyde's less. v. Torrence, 2 Yeates, 445, referred to by the learned Chief Justice, afford no countenance whatever to his opinion. In the case of Smith v. Brown, the plaintiff claimed under Pennsylvania, by a title originating in an actual settlement which commenced in 1769. The defendant claimed under a Virginia entry, reciting a settlement commenced in 1770, but which was not proved on the trial. It was decided, that the recital of the settlement in the Virginia entry, was not conclusive as against the Pennsylvania claimant. In that case, the general rule of the compact is affirmed, viz: *that there can be no reason for making a distinction between settlers under Virginia and Pennsylvania*, 1 Yeates, 517. In the case of Hyde's lessee v. Torrence, 2 Yeates, 440, 442, the court reiterated the principle decided in the case of Smith v. Brown. In both cases, however, the question whether prior settlements had been made under Virginia, was regarded by the counsel and court as material, if not vital: and in this respect they are authorities in favour of Watson's title.

Mr. Ross, for the defendants, argued.

A preliminary question arises, whether the decision of the supreme court of Pennsylvania, in this very controversy, must not be deemed conclusive. An attempt may be made to break its force by asserting that the judges were divided on the point now brought up. Where is the evidence of such division? A great number of points—some of them of little importance—were discussed on that occasion; and a difference of opinion, upon any one of them, would lead to the brief memorandum of dissent made by the reporter. But, aside from this consideration, is it not enough that in the state courts of Pennsylvania, this controversy, relating to a tract of land within her boundaries, would be considered as closed? In 12 Wheaton, 167, Mr. Justice Thompson, delivering the opinion of the Supreme Court of the United States, says, "This court adopts the state decisions, because they settle the law applicable to the case; and the reasons assigned for this course apply as well to rules of construction growing out of the common law as the statute law of the state, when

( '
applied to the title of lands. And such a course is indispensable in order to preserve uniformity; otherwise the peculiar constitution of the judicial tribunals of the states of the United States would be productive of the greatest mischief and confusion." The civil jurisdiction of the federal tribunals was conferred, in order to secure to the foreigner, or to the citizen of another state, an impartial hearing; and the institution is perverted when litigation may there be renewed, long after it had been put an end to, as between citizens of the state whose soil is the subject of controversy.

Supposing, however, the opinion of the supreme court of Pennsylvania to be open to criticism and reversal, can it be successfully assailed?

Previous to the act passed by the legislature of Virginia in 1779, a title to waste lands in that state, could not be acquired by improvement.

"Before that time, those lands might have been entered and patented, notwithstanding prior settlements by others; and even this act, which considers settlers entitled to some compensation for the risk they had run, allows them a preference only to such settlements as at that time were waste and unappropriated. As to priority of settlement, it might still remain a question between persons, both of whom claim under the same sort of title; but the law of 1779 does not set up rights of this sort so as to defeat those legally acquired under warrants: it applies to controversies between mere settlers." Such are the words of the president of her court of appeals, in delivering its opinion in Jones v. Williams, 1 Wash. Rep. 231. It is said, however, that this is predicated of prior appropriations under grants by Virginia, and not those of Pennsylvania, which were disregarded before the period of the compact. Be it so. But whatever may have been the case originally, the titles under both were, as regards the question of priority, put by the compact exactly on a footing; and are by fair construction of it, to be treated as if they, had always been so. Unless they were considered to have been, in relation to each other, valid, co-existent rights from the beginning, as far as regards jurisdiction, how could there be any comparison as to dates? The very basis of the compact is an admission that the jurisdiction shall be taken to have been in common; and that claimants under the one state, shall be entitled to the same protection against claimants under the other, that they would be entitled to between themselves. If then the plaintiff's title under Pennsylvania

[Marlatt v. Silk.]

was perfected before *Watson* had even colour of title by the laws of Virginia, will an *ex post facto* law, which it is conceded would not give him his title by relation against a prior grantee of Virginia, be more efficient against a grantee of Pennsylvania? It is an unfair construction to say, that a Virginia title shall be judged of as it happened to stand by the laws of that state at the time of the compact. If the actual origin of a title under either state be the earlier, it is not to be over-reached by a law of the other, assigning to the opposing title a fictitious origin by the doctrine of relation. Granting Virginia might lawfully declare that an unauthorized improvement should be taken to have vested title from its inception, *against herself*, yet having recognised the grants of another state as being equally valid as her own; it is fair to say she recognised them as being attended with all the incidents of her own, against which, it appears by the judgment of her own court, the doctrine of priority by relation never prevailed. Neither is the power of the two states to regulate questions of title to the soil, even at the expense of rights previously vested under either, now to be questioned. The compact is necessarily founded in an assumption of it. There was no constitutional limitation on either side; and the parties acting in the capacity of sovereigns, were fettered by no rule but their sense of expediency and justice. The consideration was the compromise of an international dispute; and the individuals whose titles were jeoparded, had no right to call on the state from which they held, to assert their rights to the soil.

In the act of ratification by Pennsylvania, it was resolved, " That although the conditions annexed by the legislature of Virginia to the ratification of the boundary line agreed to by the commissioners of Pennsylvania and Virginia, on the 31st of August, 1779, may *tend* to COUNTENANCE some unwarrantable claims which may be made under the state of Virginia, in consequence of pretended purchases or settlements pending the controversy, yet this state, (Pennsylvania,) determining to give to the world the most unequivocal proof of its desire to promote peace and harmony with a sister state, so necessary in this great contest with the common enemy, does agree to the conditions proposed by the state of Virginia in its resolves of the 31st of June last." And this was at one time supposed to be a waiver of objection to any Virginia title that should be certified. It was doubtless an agreement to close with Virginia on her own terms, and to encounter the danger of fraud and imposition of

surreptitious titles which those terms rendered more imminent; not to waive all scrutiny and submit to fraud and imposition where it might be detected. Such a construction would, in all cases, have made the certificate conclusive evidence of the facts stated in it; which it was held in Smith v. Brown, 1 Yeates, 516, and the Lessee of Hyde v. Torrence, 2 Yeates, 445, not to be. In the latter it was declared that a Pennsylvania claimant may show fraud, mistake or trust; or that the Virginia claimant was not in the country before the 1st of January, 1778—the point of time limited for the commencement of his settlement.

The following is a true history of the whole controversy:

1779, August 31.   Compact between Virginia and Pennsylvania entered into.

1780, June 23.   Ratified by Virginia with conditions annexed.

1780, September 23.   Ratified by Pennsylvania, absolutely; with acceptance of the annexed condition.

The compact was closed, and took effect on the 23d of September, 1780.

Both titles were then conclusively settled.—The states might compensate losers; but could not alter the right.

At that epoch the title of Gen. Hand stood thus:

Warrant in name of Edward Hand for three hundred acres, dated the 24th of November, 1773; surveyed the 21st of January, 1778, three hundred and eighty-nine acres. Warrant in the name of John Elder for three hundred acres, dated the 27th of November, 1773, surveyed the 21st of January, 1778, three hundred and seventy-one acres.   Three Virginia certificates for four hundred acres each, in right of these settlements, made in 1770.   All regularly entered with the Virginia surveyor, and transcribed in his entry book.

The title of all his lands in that disputed region was effectually protected against both states. When the compact was finally closed, Gen. Hand, on the faith of it, had all his surveys returned into the land office and accepted.   The purchase-money and surveying and office fees paid, exceeding (on the two tracts) 260 dollars; and on the 9th of March, 1782, patents issued on both surveys, and actual possession of both tracts by his tenants occupying the land.

At this period of time there was no caveat by Watson, or any other person; there was no dispute, no complaint.

[Marlatt v. Silk.]

Thomas Watson, in 1780, April 25, obtained a Virginia certificate, for four hundred acres, in right of his settlement made in the year 1772. His cabin and improvement were distant half a mile from the nearest part of any of Hand's surveys. No lines run or marked. No request made after the compact, to the surveyor in Pennsylvania to inclose his claim until the 1st of November, 1786, when he caused a survey to be made and returned to the land office. But it was here found to interfere with the patented surveys of other persons, and returned to him to be corrected; on the 17th of March, 1791, he presented the corrected re-survey, and obtained a patent for two hundred and seventy-three acres, "corrected and altered agreeably to a request of the surveyor-general." [Hand's patent was dated the 9th of March, 1782. That such proceeding in Pennsylvania was illegal and void, see 13 S. & R. 23.] On this false suggestion he obtained his patent which is now the *basis of the plaintiff's title.* He then sold all the survey outside of Hand's land, and removed from his house and improvement, and took possession of the cabin and land now in dispute.

Soon afterwards West Elliot set up a claim to these forty-seven acres, and gave notice that he would prosecute a suit against Watson unless he would give up the land to him.

In the autumn of 1794, Gen. Hand came with the army to Pittsburg, and went out to visit his lands. Soon after his return to town, he and Watson came to the house of Gen. Gibson, where they stated that Hand had agreed to protect Watson against Elliot, and let him hold the forty-seven acres, for his lifetime, he (Watson) paying yearly a bushel of Indian corn; and desired Gibson to defend him, and get counsel for him when necessary. To this Watson agreed, and several times afterwards called on Gibson to explain the threats used by Elliot, but Gibson encouraged him to persevere and hold on. He did continue on the land during his life. Nor is it known that he at any time expressed any dissatisfaction at this arrangement.

After his death speculators purchased the supposed rights of his children, and employed counsel to bring and prosecute suits to recover these forty-seven acres, which are now the subject of controversy.

Gen. Hand's titles under Pennsylvania and Virginia are clearly the *eldest,* and under the compact must prevail.

It is an unalterable regulation, founded in equity, to preserve the honour and good faith of both states as far as possible; each had

[Marlatt v. Silk.]

made grants for the same lands; let the good old rule prevail "prior in tempore, potior est in jure." Watson was culpably negligent; he never indicated his claim or boundary until he made an erroneous survey, the 1st of November, 1786, four years after Hand's patents had been issued; five years afterwards he sends an amended survey to the office, falsely pretending he had corrected his errors and thrown out the interfering patented lands. This trick would, of itself, postpone and preclude him, and all claiming under him, forever, from sustaining any suit in a court of justice Besides this, he surrendered to Gen. Hand all his claim to the premises, for a life estate which he enjoyed and with which he was satisfied as long as he lived; and the plaintiffs, for a trifle, have brought up the claim that he had ceased to assert and was too honest to revive.

Hand's lands were patented the 9th of March, 1782; Watson's the 17th of March, 1791, nine years afterwards. Watson's assignees being now plaintiffs, and holding under the junior grant; cannot maintain an ejectment, or recover in a court of the United States against the eldest patent.

More especially must Watson's patent fail, when a solemn compact has established the relative efficacy of each, and expressly stipulated that all conflicting titles in the disputed territory shall, without exception, be governed by this rule.

A survey breaking into and including patented land, is void; was always illegal and inoperative in Pennsylvania. 13 Sergeant and Rawle, 23.

Upon the whole, therefore, of this record, the defendants in error submit with great confidence that the judgment of the district court of the United States will be affirmed with costs.

Mr. Justice BARBOUR delivered the opinion of the Court.

This is a writ of error to the district court of the United States, for the western district of Pennsylvania, in an action of ejectment, in which the plaintiff in error was plaintiff in the court below; and in which judgment was given for the defendant in that court. It comes up upon two bills of exception, taken by the plaintiff in error to the opinion of the court, at the trial: the one, in relation to the admission of certain evidence which he alleges to have been improperly received; the other, to the ruling of the court, upon several points of law, in its charge to the jury.

We think it unnecessary to discuss any of these points but one,

which we consider decisive of the case. And that is the relative priority of the respective rights under which the parties claim.

The facts of the case are these. Thomas Watson, under whom the plaintiff in error claims, on the 25th of April, 1780, obtained from certain commissioners of Virginia, a certificate entitling him to four hundred acres of land, by virtue of an act of the assembly of Virginia, passed in May, 1779; the fourth section of which, after reciting that great numbers of people have settled in the country, upon the western waters, upon waste and unappropriated lands, for which they have been hitherto prevented from suing out patents, or obtaining legal titles, &c., enacts, "That all persons, who, at any time before the first day of January, in the year one thousand seven hundred and seventy-eight, have really and bona fide settled themselves, or their families, or at his, her, or their charges have settled others, upon any waste, or unappropriated lands, on the said western waters, to which no other person hath any legal right or claim, shall be allowed, for every family so settled, four hundred acres of land, or such smaller quantity as the party chooses to include such settlement." This certificate was granted in right of a settlement which had been made by Watson, in the year 1772. His evidence of right under Virginia was subsequently transferred to the land office of Pennsylvania, (the land having, under a compact between that state and Virginia, hereafter more particularly noticed, been ascertained to be within the limits of Pennsylvania;) and on the 1st of November, 1786, a survey of his claim was made and returned to the land office of the latter state, and a patent issued thereon by that state in the year 1791, including his settlement made in 1772, and including the land in controversy.

The defendants claim under Edward Hand, who, by virtue of two land warrants, granted by Pennsylvania, the one for three hundred acres, dated the 24th of November, 1773, the other for the same quantity, dated the 27th of November, 1773; caused surveys to be made on both on the 21st of January, 1778; and on the 9th of March, 1782, obtained patents on both surveys, embracing the land in controversy.

Both Pennsylvania and Virginia having claimed the territory, of which the land in controversy is a part, as being within their limits; the dispute was finally adjusted by a compact made between them, which was ratified by Virginia on the 23d of June, 1780, with certain conditions annexed; and absolutely by Pennsylvania, on the 23d

[Marlatt ꝟ. Silk.]

of September, 1780, with an acceptance of the conditions annexed by Virginia.

That compact, inter alia, contains the following stipulation: " That the private property and rights of all persons, acquired under, founded on, or recognised by the laws of either country, previous to the date hereof, be secured and confirmed to them, although they should be found to fall within the other, and that in disputes thereon, preference shall be given to the elder, or prior right, whichever of the said states the same shall have been acquired under; such persons paying to the states, in whose boundary their land shall be included, the same purchase, or consideration-money, which would have been due from them to the state under which they claimed the right."

The rights of the parties must be decided by the true construction of this stipulation, as applied to the foregoing facts of the case. What is that construction? In the first place it is declared, that the property and rights of all persons, acquired under, founded on, or recognised by the laws of either country, *previous to the date of the compact*, (that is, the year 1780) shall be secured and confirmed to them. The act of Virginia of May, 1779, before cited, is in point of chronology previous to the date of the compact. Is not the settlement of Watson, made in 1772, recognised by that act? It is in explicit terms, because the act makes an allowance of four hundred acres of land to all those who shall have bona fide made a settlement on waste and unappropriated land, before the first of January, 1778; and it has been seen that Watson's settlement was made in 1772. What was the motive which induced the legislature of Virginia to make this allowance? We find it declared in the preamble to the fourth section of the act of May, 1779: it was, that persons who had made settlements, had been prevented from suing out patents, or obtaining legal titles, by the king of Great Britain's proclamations, or instructions to his governors, or by the then late change of government, and the then present war having delayed, until that time, the opening of a land office, and the establishment of any certain terms for granting lands. And what was the consideration, we do not mean pecuniary, but valuable, on which the allowance was founded? The same preamble informs us, that it consisted in the justice of making some compensation for the charge and risque which the settlers had incurred in making their settlements.

It is apparent, then, that the legislature did not pass the law in

question as making a *donation*, but as allowing a reasonable compensation, for something of value, on the part of settlers; not of money indeed, paid into the coffers of the state, but of charge and risque incurred by the settlers. We think, then, that the allowance thus made, is, in the language of the compact, a right recognised by the law of Virginia previous to the date of that compact. Considering it as thus recognised, and consequently as secured and confirmed, we come now, in the order of the argument, to the other part of the stipulation aforesaid; which declares, that in disputes thereon, preference shall be given to the elder or prior right, whichever of the said states the same shall have been acquired under.

How is this question of priority to be decided? In answering this question, we think, that the first thing to be done is to ascertain the character of the rights of the parties, as settled by the laws of the states, under which they respectively claim, as these laws stood *at the date of the compact.* In this aspect of the subject, it has been seen that the defendants claim under warrants granted by Pennsylvania in 1773, and surveyed in 1778. But the act of Virginia of 1779, having allowed 400 acres of land to those who had made a settlement before the first of January, 1778, and having founded that allowance on the charge and risque which they had incurred; in our judgment, the equitable claim, or the inchoate right of the parties, must consequently be referred, for its commencement, to the period when the charge and risque were incurred—that is, in the case at bar, to the year 1772. If, as we think, this principle be correct, this mere comparison of dates would decide the case. It has, however, been argued, that if this case were in a Virginia court, it would be decided in favour of the right under which the defendants claim, because that is by warrant, before the act of 1779; and in support of this, the court has been referred to the case of Jones v. Williams, 1 Washington, 230, in which the court of appeals of that state says, that before the act of 1779, those lands (that is, lands on which settlements had been made) might have been entered and patented by any person, notwithstanding prior settlements by others. That the act of 1779 applies to controversies between mere settlers. That it does not set up prior rights of this sort, so as to defeat those legally acquired under warrants.

The error of this argument, as we conceive, consists in this; that the doctrine here stated, however true in itself, does not apply to the case at bar. That was laid down, in a case, between two persons,

[Marlatt v. Silk.]

both of whom claimed under Virginia, and was therefore governed by the laws of Virginia, *alone;* whereas in this case, one of the parties claims under Pennsylvania, and the other, under Virginia; and the case is to be decided, not by the laws of either state, by themselves: except that as before remarked, the character of each right is to be fixed by the laws of the state, as at the time of the compact under which the right is claimed; and then the comparison between the two is to be made, not under the laws of either state, but under the stipulation in the compact before referred to. Thus to illustrate, the origin of the plaintiff's claim, being, in our opinion, as operated upon by the act of Virginia of 1779, to be referred to the period of Watson's settlement in 1772; and that of the defendants, as affected by the laws of Pennsylvania, being of later date; the foundation being thus laid for deciding which is the prior or elder title; we then apply to the case the compact, which declares, that the preference shall be given to the prior or elder.

We suppose that it will scarcely be denied, that by the act of 1779, Virginia recognised the inception of the title of settlers, as being of the date of the settlement as against herself; if so, can it be imagined, that by the compact, she intended their title to take its date from a later period? If it should be said, that so also Pennsylvania cannot be supposed to have intended to impair the force of the titles claimed under her; the answer, that each state intended that its own laws should settle the character of the right claimed under it, as to the time of its inception, and in every other respect; and then, that according to the inception thus fixed, the rule of priority should decide, as provided for in the compact.

It was argued, that the question had been settled in the supreme court of Pennsylvania; and the doctrine stated in 12 Wheat. 167, was referred to, where it is said—That this court adopts the state decisions, because they settle the law applicable to the case; and the reasons assigned for this course, apply as well to rules of construction growing out of the common law, as the statute law of the state, when applied to the title of lands. To say nothing of the division of the court, in the case referred to, it is a decisive answer to this argument, to say—That the principle does not at all apply. It was laid down in reference to cases arising under, and to be decided by the laws of a state; and then the decisions of that state are looked to, to ascertain what that law is; whereas in the case at bar, the question arises under, and is to be decided by, a compact between *two*

[Marlatt v. Silk.]

*states:* where therefore the rule of decision is not to be collected from the decisions of either state, but is one, if we may so speak, of an international character. Upon the whole, we are of opinion, that the judgment of the court below was erroneous in charging the jury, that the title of the defendants was the elder and prior right, and was therefore protected by the compact; on the contrary, we think that of the plaintiff was the elder and prior: the judgment must therefore be reversed, and a venire facias de novo awarded.

Mr. Chief Justice TANEY and Mr. Justice M'LEAN, dissented.

Mr. Justice M'LEAN.

The Chief Justice and Justice M'LEAN think that the condition of the compact, "that the private property and rights of all persons acquired under, founded on, or recognised by the laws of either country previous to the date hereof, be secured and confirmed to them, although they should be found to fall within the other; and that in disputes thereon, preference shall be given to the elder or prior right, whichever of the said states the same shall be acquired under," placed the land in controversy under the common jurisdiction of both states; and that the first appropriation of the land, under the authority of either state must be considered, under the compact, as the prior right.

The Pennsylvania warrant which was located on this land, was surveyed on the 21st of January, 1778. At this time the Virginia claimant, though he lived on the land, had no colour of right. He was in fact a trespasser.

The Virginia act of 1779 provided, "that all persons, who, at any time before the 1st of January, 1778, had bona fide settled upon waste or unappropriated lands, on the western waters, *to which no other person hath any legal right or claim,* shall be allowed four hundred acres," &c.

Now, if the land in controversy was subject to the jurisdiction of both states, and might be appropriated by either, was it not appropriated under the Pennsylvania warrant, before the Virginia claimant had any right under the act of 1779? This is too clear to be controverted. In the language of the compact, then, had not the Pennsylvania claimant "the prior right?"

The act of 1779 does not purport to vest any title in the settler

anterior to its passage. The settler, to bring himself within the act, must show that he was a bona fide settler before the 1st of January, 1778; and this entitled him to four hundred acres of land under the act, provided, "*no other person had any legal right or claim to it.*"

At this time the land, as has been shown, was appropriated under the Pennsylvania law, and which appropriation, if effect be given to "the prior right," under the compact, does constitute within the meaning of the act of 1779, a "right or claim to the land."

In 1 Wash. Rep. 231, the court of appeals of Virginia says, that the law of 1779 does not "set up rights so as to defeat those legally acquired under warrants."

This land, by the compact, was considered as liable to be appropriated by a Pennsylvania as by a Virginia warrant, before the act of 1779; and in ascertaining the priority of right the time of the appropriation is the fact to be established.


This cause came on to be heard on the transcript of the record from the district court of the United States for the western district of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court that the judgment of the said district court in this cause be, and the same is hereby reversed, and that this cause be, and the same is hereby remanded to the said district court, with directions to award a venire facias de novo.