Eastern Ky. Coal Lands ·Corp. v. Commonwealth (4 cases).

---

CASE 67.—SEPARATE PROCEEDINGS BY THE EASTERN COAL LANDS CORPORATION IN THE COUNTY COURTS OF THE COUNTIES OF PIKE, FLOYD, KNOTT AND LETCHER AGAINST THE COMMON-WEALTH TO LIST FOR TAXATION CERTAIN LANDS, UNDER ·ACTS OF THE KENTUCKY LEG-ISLATURE OF 1906.—October 20.

# Eastern Ky. Coal Lands Corp. v. Common-wealth (Four Cases).

| | |
|---|---|
| 127 | 667 |
| f128 | 617 |
| f128 | 618 |
| f128 | 625 |
| 127 | 667 |
| 131 | 547 |
| ·127 | 667· |
| f132 | 100· |

Appeal from the Circuit Courts of Pike, Floyd, Knott and Letcher counties.

D. W. GARDNER, Judge Thirty-fiirst Judicial Dis-trict.

Both the county and circuit court refused to list the lands and on appeal affirmed.

1. Appeal—Jurisdiction—Decision of Intermediate Court—Con-clusiveness.—Acts 1906, p. 115, ch. 22, art. 3, section 1, makes

it the duty of an owner or claimant of land to pay all the taxes which have been or should have been assessed against him as of the years 1901—1905, inclusive, and provides that failure to list for assessment or failure to pay the taxes charged for any three of the years shall be cause for forfeiture to the Commonwealth of his title, which cause of forfeiture shall be extinguished if the owner shall cause the land to be assessed for taxation before March 1, 1907. Section 2 provides that the ascertainment of the amount of taxes unpaid and assessments required by the preceding section shall be made by the county court on the application of the owner, that either the petitioner or the Commonwealth may appeal to the circuit court, and that the finding of the circuit court shall be conclusive and not subject to appeal. Ky. Stats., 1903, section 950, allows appeals to the court of appeals where the title to land is involved or the amount in controversy is not less than $200, and from all other final orders and judgments. Held, That the court of appeals had jurisdiction of an appeal from a judgment of the circuit court, on appeal from the county court, refusing to list lands on petition under section 2, in that the petition was not sufficient under the statute; the word "finding" relating to the fixing of the value of the property assessed alone.

2. Taxation—Assessment—Constitutional Officers—Powers—Statutory Provisions.—Acts 1906, p. 115, ch. 22, art. 3, section 1, makes it the duty of an owner or claimant of land to pay all taxes which have been or should have been assessed against him as of the years 1901—1905, inclusive, and provides that failure to list the land for assessment or to pay the taxes charged as of any three of those years shall be cause of forfeiture of his title to the Commonwealth, which cause of forfeiture shall be extinguished if the owner shall cause the land to be assessed before March 1, 1907. Section 2 provides for the ascertainment of the amount of taxes unpaid and assessments required by the preceding section by the county court on application of the owner. Section 3 provides that, if the owner shall fail to have the land assessed, the Commonwealth's attorney shall institute a proceeding to forfeit the same to the Commonwealth. Section 4 provides for a purchase back by the owner of the title so forfeited on ascertainment by the county court of the amount of unpaid taxes. Constitution section 227 creates the office of assessor, but does not define his duties. Section 172 provides for punishing "any officer or other person authorized to assess values

for taxation," who shall willfully commit any error. Held, That the act is not unconstitutional, on the ground that it takes from the assessor, a constitutional officer, the power conferred on him alone by the Constitution to assess real estate; the Constitution seeming to imply that the Legislature may provide other persons to assess property.

3. Statutes—Special Legislation—Classification of Subject—Taxation.—The act is not in violation of Constitution section 59, prohibiting local and special legislation, though it may not apply to every county in the State; the classification of the subject, lands which have been omitted from taxation for a great number of years, being a legitimate exercise of legislative discretion.

4. Taxation—Constitutional Requirements—Public Purposes.— Acts 1906, p. 124, ch. 22, section 6, provides that all title proceeded against and forefeited to the Commonwealth, and not purchased by the owner under section 4, is thereby vested in any person who has had adverse possession for five years and paid the taxes. Section 7 provides that all title vested in the Commonwealth, and not purchased back under section 4, nor vested in the occupant under section 6, shall be sold to the highest bidder, and out of the money so realized shall be paid the commissioner's fee and a reasonable attorney's fee. Held, That the act was not in violation of Constitution section 171, that taxes shall be levied for public purposes only, on the ground that investing the occupant with the forfeited title shows that he is the intended recipient of the tax, and that the payment of a part of the proceeds to the officers representing the State is also a provision for their private purposes; such contention confusing the tax levied on the lands and the disposition thereof after forfeiture.

5. Statutes—Expression in Title of Subject of Act.—The revenue law of 1906, the title of which is "An Act relating to revenue and taxation," is not, as to page 115, ch. 22, art. 3, in violation of Constitution section 51, requiring an act to relate to but one subject, which shall be expressed in its title.

6. States—Compacts Between—Violation of Virginia Compact— Taxation.—The Virginia Compact provides that all private rights and interests in lands over which Virginia surrendered sovereignty, derived from the laws of Virginia, shall remain valid and secure under the laws of the proposed State of Kentucky. Held, That Acts 1906, p. 115, ch. 22, relating to taxation of lands in the State, was not in violation of the Compact; patents to land issued by Virginia being subject to the right and power of the sovereign to compel

the payment of taxes on the land in the future, and to the correlative power to forfeit the title as a penalty for non-payment.

7.  Taxation — Constitutional Requirements—Uniformity—Double Taxation.—Acts 1906, p: 115, ch. 22, art. 3, section 1, providing that an owner or claimant of land shall pay all taxes which have been or should have been assessed against him for the years 1901—1905, inclusive, and that the fact that the land has been listed for taxation or the taxes have been paid thereon· by another claimant shall not relieve him, is not in violation of the constitutional requirement that taxation shall be uniform, as being double taxation.

8.  Constitutional Law—Due Process of Law—Taxation.—The act is not in violation of the Federal and State Constitutions, as that it does not constitute due process of law.

9.  Same—Ex Post Facto Laws.—The act is not an ex post facto act; the failure to list in the years 1901—1905, inclusive, not working a forfeiture, but the failure after the passage of the act in 1906 to thereafter list the property for those years.

10.  Same—Retrospective Taxation.—The act is not, because imposing retrospective taxation, in violation of either the State or Federal Constitution.

11.  Statutes—Validity—Review of Policy of Legislature.—Though the objections to an act, that it is harsh, oppressive, and unjust, were well founded, they would afford no basis for declaring the act invalid, since the policy of the Legislature may be looked into by the courts for the purpose only of interpreting statutes, and not of declaring their invalidity.

12.  Taxation—Assessment—Proceedings to List—Sufficiency of Petition.—Acts 1906, p. 115, ch. 22, art. 3, section 1, makes it the duty of an owner or claimant of land to pay all the taxes which have been or should have been assessed against him for the years 1901—1905, inclusive; and section 2 provides that the ascertainment of the amount of taxes' unpaid and the assessments required by the preceding section shall be made by the county court on application by the owner by verified petition, in which the land shall be described so as to be identified. A petition filed under section 2 alleged that the petitioner claimed to be the owner of the therein described tracts of land, but not of the improvements thereon, nor of the surface of certain parts of each tract, following which was a description by calls and distances, and the petition then set out the patents and instruments through which petitioner derived title, and alleged that the lands had not been listed for taxation for any of the years 1901—1905,

inclusive, by petitioner, but that parts had been listed by others, and the taxes paid. Held, That the petition was defective, in that it showed only that petitioner was "an owner," and did not show of what part or in what proportion and by whom the remaining portions were owned.

13. Same.—The petition was defective, in that it did not "so describe the land proposed to be assessed' as that "it could be identified," since the interest of the listing owner, if he owns less than the entire tract, must be so described as that it can be identified.

14. Same.—The petition was defective, in that, showing that the patent boundaries described lay only partly in the county wherein it was proposed to list the land, it did not show in what part of the county the parts to be assessed lay, nor where the excluded parts, which it was admitted did not belong to the petitioner, lay.

15. Same.—It is not an answer to the defects in the petition that the taxpayer did not know his property or its description, nor that it woud be too expensive for him to make the necessary investigation.

WM. J. HENDRICK, HOPPIN & BERARD, HAZELRIGG, CHENAULT & HAZELRIGG, JOHN HARRIS HENDRICK and ROBERT L. MILLER for appellant.

N. B. HAYS, Attorney General, CHAS. H. MORRIS, HAGER & STEWART, T. H. PAYNTER, W. ʀ. WADSWORTH, DAVID BAIRD, Z, T. VINSON, EDWARD W. HINES and C. C. McCHORD for the Commonweatlh.

(No briefs—Record not in office.)

OPINION OF THE COURT BY CHIEF JUSTICE O'REAR— Affirming.

These four appeals, presenting a common question, are heard together. They involve the constitutionality and construction of article 3 of the revenue law passed by the General Assembly of 1906. Laws 1906, p. 115, c. 22. For a full study and understanding of that article, it is set out complete, and is as follows: "Section 1. It shall be the duty of every owner or

claimant of land to pay all the taxes which have been assessed, and which should have been assessed, against him, and those under whom he claims, as the owner or claimant of said land as of the 15th day of September, 1901, the 15th day of September, 1902, the 15th day of September, 1903, the 1st day of September, 1904, and the 1st day of September, 1905; and if the said owner or claimant, or those under whom he claims, has failed to list said land, or any part thereof, for taxation, as of said dates, or any of them, it shall be his duty to have same assessed and listed for taxation, in the manner and within the time hereinafter provided, as of each of said dates for which the assessment has been omitted, and to pay the taxes, interest and penalties thereon as herein provided. The fact that said land has been listed for taxation, or the taxes have been paid thereon by another claimant, shall not relieve against the duty herein imposed. If any such owner or claimant, or those under whom he claims, has failed to list such land for assessment and taxation, as of any three of said dates, or has failed to pay the taxes charged, or which should have been charged against him, or those under whom he claims, as the owner or claimant thereof upon said dates, for any three of the years for which said assessments were or should have been made, said owner and claimant and those under whom he claims are hereby declared to be delinquent; and such failures, or either of them, shall be cause for the forfeiture and transfer to the Commonwealth of his said claim and title thereto, in a proceeding to be instituted for that purpose, as hereinafter provided. But said cause for forfeiture shall be extinguished if said owner or claimant, his heirs, representatives, or assigns, shall, within the time and

in the manner in this article provided, cause said land to be assessed for taxation, and, on or before March 1, 1907, pay the taxes charged, and which should have been charged against him, or against those under whom he claims, as the owner or claimant thereof, for each and all of said five years, for which he or those under whom he claims are delinquent, together with the interest and penalties provided by law in case of the redemption of land sold for the non-payment of taxes.

"Sec. 2. The ascertainment of the amount of taxes unpaid and the assessments required by the preceding section shall be made by the county court of the county wherein the land lies, upon the application of said owner or claimant, by a petition verified by himself or his agents, filed in said court on or before January 1, 1907, in which the land, sought to be charged shall be described, so as to be identified, and the years for which it was not listed and the years in which the taxes were not paid shall be stated, and in which also shall be stated the grant under which he claims, if he derives title from a grant, and the instrument through or the manner in which the title devolved upon him. Said application shall be set for hearing upon a day to be fixed by the applicant, not less than ten nor more than twenty days after the filing of the petition, of which he shall give at least ten days' written notice to the county attorney, whose duty it shall be to attend said hearing and represent the State and county; for which service he shall receive as compensation ten per centum of the amount ultimately collected by sale or otherwise, by virtue of such delinquency. It shall be the duty of the county court to decide upon said application in a summary manner, upon such evidence as may be offered, hav-

ing due regard to the value of adjacent property as of said dates, and to ascertain the amount of unpaid taxes which the applicant and those under whom he claims should have paid for any and all of said years, whether assessments were originally made as of said dates or not. Upon finding the amount, the court shall also ascertain the proportion of such taxes due for county and State purposes at the rates fixed by law for such years; and shall cause a record of the findings to be made on the order book of the court, and certified to the Auditor of the State and county clerk. Should the court find that the land had been assessed against such owner or claimant, or those under whom he claims, as of any said dates, it shall accept such assessments as a basis upon which to ascertain the amount of unpaid taxes for the year such assessment may have been made. Either the petitioner or the Commonwealth, feeling aggrieved by the finding of the county court, shall have the right to take an appeal, within thirty days after the entry of the findings of the county court, to the circuit court for said county, in the manner that other appeals are taken, except that no bond shall be required of the Commonwealth. It shall be the duty of the circuit court to hear and determine said application de novo, and to give it precedence over all other civil business in said court. The finding of the circuit court shall be conclusive and not subject to appeal. A copy of the findings shall be certified to the Auditor of the State and to the clerk of the county court. As soon as the time for appealing from the finding of the county court has expired, if no appeal is taken, or as soon as the final order of the circuit court is entered, if an appeal is taken, the obligation of said owner or claimant to pay the taxes therein called for,

with interest and penalties, as provided by law for the redemption of land sold for the nonpayment of taxes, shall be complete; and the same shall be paid to the sheriff of the county within thirty days thereafter. Provided, however, that if in a proceeding hereunder begun within the time allowed, the amount payable by the delinquent shall not be finally determined until within less than thirty days before March 1st, 1907, or until after said date, then the right of forfeiture as set out in section 1 of this article shall not be complete in the Commonwealth, unless and until said delinquent shall have failed to pay said amount, interest and penalties, for thirty days after the entry of said order. Upon collecting said taxes, interest and penalties, the sheriff shall, after paying the costs of the proceedings and retaining the commission allowed by law for himself, pay over and account for the remainder to the Auditor of the State and to the county, in the same manner and subject to the same responsibilities of himself and his bondsmen as in the case of other taxes collected by him. Out of the amount so paid, there shall be paid to the county attorney ten per centum thereof and an additional ten per centum to the Commonwealth's attorney, should an appeal have been prosecuted to the circuit court.

"Sec. 3. If any such owner or claimant shall fail to have said land assessed, or fail to pay the taxes charged, or which should have been charged against him, or those under whom he claims, as the owner or claimant of any such tract of land, as provided and within the time prescribed in section 1 and 2 of this article, together with the penalties and interest as provided by law, then.it shall be the duty of the Commonwealth's attorney to institute in the circuit court

of the county in which said land or any part thereof, lies, a proceeding in equity, in the name of the Commonwealth of Kentucky as plaintiff against said tract of land, and the owners or claimants of said land as defendants, naming them; if their names are unknown to him, designating them as the unknown owners and claimants thereof for the purpose of declaring the title or claim of said defendants forfeited to this Commonwealth and selling same. The suit so instituted shall be proceeded with to final judgment in all respects as other equity causes so far as applicable. In addition to the requirements of the Civil Code of Practice respecting process and service thereof, notice shall be given of the pendency of said action by posting a copy of the petition at the front door of the court house, which shall be done by the clerk immediately after the petition is filed, and he shall show by endorsement upon the original petition the time at which said copy was so posted. The defendants shall not be required to answer until after the expiration of thirty days from the posting of said copy. And such copy when so posted, shall be deemed notice to all defendants of the pendency of said action and its object. The petition of the plaintiff shall allege the facts constituting the cause of forfeiture under the provisions of this article, and there shall be filed with it a copy of the grant or instrument upon which the title or claim sought to be forfeited is based; and no other title, claim or possession, or continuity thereof, whether owned or claimed by the defendant or by others, shall be forfeited or in any manner be affected by said proceeding. The prayer shall be for a judgment of forfeiture and sale of the title or claim in the petition described. The court shall render judgment in accordance with the pleadings,

exhibits and evidence adduced; and if it shall find that said title or claim sought to be foreited is or has been subject to forfeiture under the provisions of this article, it shall render judgment declaring the same forfeited and the title thereto vested in the Commonwealth. Such judgment shall operate as a transfer to and vesting in, the Commonwealth of the said title and claim of each and all the defendants, and those under whom they claim, without execution of deed or other instrument. If the court shall find that the same is not subject to forfeiture under the provisions of this article, then it shall so adjudge and dismiss the petition of plaintiff. Judgments rendered by the circuit court under this article shall be conclusive as against all defendants, including infants, lunatics and married women, as to their title or claim derived through or under the grant, title or claim described in the petition; and said judgments and the proceedings upon which they are based shall not be subjected to the provisions of sections 391, 410, 414 or 574 of the Civil Code of Practice. Issues as to whether or not the title and claim sought to be forfeited is or has been subject to forfeiture under the provisions of this article, shall be triable by jury; and the judgment of the court shall be in accordance with the verdict, as in ordinary actions. Either party may prosecute an appeal from such judgment to the court of appeals within thirty days after the same may be entered; but if any such appeal be prosecuted, the transcript of the record shall be filed in the court of appeals within sixty days after the entry of said judgment; and the hearings upon appeal shall have the same precedence as other Commonwealth cases. No bond on appeal shall be required of the Commonwealth.

"Sec. 4. If, before or during the term of the circuit court next succeeding the term at which a judgment of forfeiture may have been entered, as authorized by section 3 of this article, any of the said defendants in privity with the title so forfeited to, and vested in the Commonwealth, file his counterclaim in said action, accompanied by a bond, with good and sufficient resident personal security, to be approved by the court, if in session, otherwise by the clerk of the court, conditioned to pay, and in all respects abide by and perform, the judgment that the court may enter upon such counterclaim, and in said counterclaim offer to purchase back from the Commonwealth the title and claim in said action so forfeited to, and vested in, the Commonwealth, and praying to be allowed so to do, and exhibiting title thereto in himself, it shall be the duty of the court, upon proper pleadings as in other equity cases, and upon such evidence as may be adduced in the manner authorized by law, to ascertain and adjudge the amount of unpaid taxes, charged and that ought to have been charged against the defendant and those under whom he claims, as the owner or claimant of said land, for fifty years immediately preceding the filing of such counterclaim, and if the court finds and adjudges that said defendant is the owner of the title so forfeited to and vested in the Commonwealth, to enter a judgment against said defendant for a sum equal to the amount of the unpaid taxes charged, and that ought to have been charged, against said defendant, and those under whom he claims as the owner or claimant of said land, for said fifty years, together with interest thereupon at the rate of 15 per cent. per annum from the time of the said unpaid taxes for said several years were due, and the costs of the proceedings,

Eastern Ky. Coal Lands Corp. v. Commonwealth (4 cases).

including a reasonable attorney fee for the Common-
wealth's Attorney, to be fixed by the court: Provided,
that no person except a defendant, and no defendant,
except as herein provided, shall be allowed to pur-
chase back from the Commonwealth the title so for-
feited to, and vested in it except such defendant as
may, but for such forfeiture, establish in such pro-
ceeding a title thereto in himself upon which he could
maintain an action of ejectment. If, thereupon, such
defendant shall pay to the sheriff the amount of such
judgment, it shall be the duty of the court to enter
judgment retransferring to such defendant the title
and claim so forfeited to, and vested in, the Com-
monwealth; and said judgment shall have the effect
of retransferring and vesting same in said defendant
without the execution of a deed or other instrument.
Should such defendant not thereupon pay said judg-
ment, the court shall thereupon enter an order direct-
ing the sale of the said title and claim as in section 7
of this article provided, and the amount realized upon
said sale shall be used in the payment of costs and
commissions hereunder; and the remainder, if any,
shall be paid to the State and county as provided in
this article, and the counterclaim shall be dismissed.
If the sale does not produce enough to pay the costs,
an action may thereupon be maintained upon said
bond for the costs, and reasonable attorney's fee
for the Commonwealth and county attorney, to be
fixed by the court. If at any time during the pend-
ency of said action it shall be made to appear that
the bond theretofore tendered and approved by the
court or the clerk is insufficient, additional security
shall be required, and the failure to execute same
upon being so required shall have the same effect as
if no bond had been given originally, and the counter-

claim shall be dismissed. Appeal may be prosecuted to the court of appeals from the judgment of the circuit court under this section within the time and in the manner and subject to all the conditions provided for appeals in section 3 of this article, except that the judgment of the circuit court as to the amount thereof shall be final and not subject to appeal. All amounts paid to the sheriff under this section shall be by him received and paid out to the persons entitled to the same as costs, and the remainder to the Auditor of the State and to the county in proportion to the amount due them for taxes and penalties for the said fifty years, in the same manner and subject to the same responsibilities of himself and his bondsmen as in the case of taxes collected by him: Provided, that fees required by law to be paid to the Auditor shall be paid to him by the sheriff, and by the Auditor paid to the person entitled thereto. It shall be the duty of the county attorney to assist the Commonwealth's attorney in all proceedings under this article for which he shall be allowed the per centum as herein provided. Certified copies of the judgments of the circuit court, under sections 3 and 4 hereof, shall be recorded in the deed books of the county where the land, or any part thereof, lies, and indexed as deeds are required to be indexed.

"Sec. 5. Any owner or claimant who instituted a proceeding allowed by section 2 of this article, and who did not, within the time herein limited, pay the amount herein ascertained as charged or chargeable against him and those under whom he claims, as the owner or claimant of said land, shall not be allowed the right to purchase back, under the proceedings authorized by section 4 of this article, such title or

claim so forfeited to, and vested in, the Common-
wealth.

"Sec. 6. All title and claim proceeded against
under this article and forfeited to, and vested in, the
Commonwealth and not purchased back by the owner
or claimant 'thereof, as authorized in section 4 hereof,
whether such forfeiture be for the past delinquencies
or for future delinquencies as authorized under sec
tion 10 hereof, shall be, and is hereby, transferred to,
and vested in, any person for so much thereof as such
person, or those under whom he claims, has had the
actual adverse possession for five years next pre-
ceding the judgment or forfeiture, under claim, or
color of title, derived from any source whatsoever,
and who, or those under whom he claims, shall have
paid taxes thereupon for five years in which such pos-
session may have been or may be held; and in those
in privity with such person, his heirs, representa-
tives or assigns, as to the mineral or other interests
or rights in or appurtenant to such land.

"Sec. 7. All title and claim to land transferred
to, and vested in, the Commonwealth under the pro-
visions of this article and not purchased back by the
owner or claimant as provided by section 4, and not
vested in the occupant, as provided in section 6, shall
be sold to the highest and best bidder for cash in
hand.  Said sale shall be made pursuant to a judg-
ment of the circuit court in said action, and shall be
at public auction at the front door of the court house
on the first day of some regular term of the circuit
court, after notice of sale·shall have been advertised
in the manner required by law in the case of sales
of land under execution.  The commissioner shall re-
port the sale to the court for its confirmation, and,
when confirmed, the court shall order the commis-

sioner to make a deed to the purchaser. Such deed shall operate to transfer to said purchaser such title and claim to the land so forfeited and transferred to, and vested in the Commonwealth as remains in it after the operation of section 6 of this article, and shall so recite. The money realized from the sale shall be paid out and distributed as follows: First, to the payment of the costs of the suit, including commissioner's fee as fixed by law and a reasonable atttorney's fee, to be fixed by the court and paid in the manner provided by law; second, to the county and State the proportion to which each may be entitled, together with interest and penalty, as in this article provided; third, the remainder shall be paid over to the former owner or claimant or his personal representatives or assigns.

"Sec. 8. No action to enforce a forfeiture as authorized and provided in this article shall be instituted after the expiration of five years from the accrual of the right thereto.

"Sec. 9. No owner or claimant of any land in this Commonwealth shall be allowed to prevent the operation of this article by the payment, after January 1st, 1906, of any amount less than the whole of the unpaid taxes, interest and penalties provided by law, that were charged, and that should have been charged against said owner or claimant of said land and those under whom he claims, as of each and all of said five dates, first mentioned in section 1 hereof; and where such payment is made after the passage of this act, the amount to be paid shall be ascertained and payment made, as in this article provided. .

"Sec. 10. When, for any successive five years after the first day of August, 1906, any owner or claimant of or to any land in this Commonwealth

shall fail to list same for taxation and cause him-
self to be charged with the taxes properly chargeable
thereon, or fail to pay the same as provided by law,
then such failure shall be cause for the forfeiture of
his title and claim thereto, and the transfer of the
same to, and vesting it in, the Commonwealth of
Kentucky. And wherever such failure exists, it shall
be the duty of the Commonwealth's Attorney to insti-
tute an equitable action in the circuit court of the
county wherein the said land, or a part thereof, lies,
for the purpose of declaring said forfeiture and vest-
ing said title and claim thereto in the Commonwealth
of Kentucky, and for the sale of such parts thereof
as, under the provisions of this article, are liable to
sale.   Such actions and proceedings pertaining
thereto shall conform to the provisions of this article
as far as the same may be applicable."

It is also proper, and perhaps necessary, to set out
here so much history of the State as will disclose the
evil sought to be remedied by this act, in order that
the legislative purpose may be more surely divined.
While prior to 1779 a considerable quantity of the
wild lands of Virginia west of the Allegheny mount-
ains had been appropriated by patents under the
stimulus of enterprising adventurers and the policy
of the colony to encourage emigration and the settle-
ment of the vast wilderness territory then inhabited
almost exclusively by savages, it was after the War
of the Revolution, when the returning soldiers from
the Continental army were to be compensated in a
measure by such favor as the State could bestow, that
the real tide of emigration to the West set in. In
1779 Virginia established a land office, and created
the office of Register of the Land Office. Most liberal
inducements were offered settlers of "waste and un-

appropriated lands.'' There was no limit to the quantity any person might appropriate. Surveyors were appointed for the western territory upon the nomination of the president and professors of William and Mary College. They were required to make records of entries and surveys under them. Their peripatetic offices were widely scattered. The territory opened up for settlement under this act was that part of Virginia south of the Ohio river, east of Green river, west of the Cumberland mountains and north of the Carolina line, excepting certain Indian reservations. In other words, it comprised all of the eastern and most of the central part of what is now the State of Kentucky. The surveyors so appointed could appoint any number of deputies, and did appoint a great many. Aside from the lack of roads and the difficulties of travel in a region of unbroken forests, with great rivers and mountains to be traversed, the dangers from bands of roving savages and wild beasts that infested that vast region made intercommunication between these officers both diffi- cult and dangerous. 2 Collins' Hist. Ky. 552, 563. There was a constantly growing tide of immigration into the newly opened territory. Many of the immi- grants, probably the most of them, were intending settlers. But, as might have been expected, specu- lators and adventurers not a few were attracted thither by the glowing accounts which were carried back to the older settlements in the east. Large tracts, some of them for many hundred thousand acres, were entered, located, and surveyed, while many thousand smaller tracts, designed for imme- diate or present actual settlement, were taken up at the same time. So rapid was the growth of popula- tion that in 1790 the white population of that terri-

tory which later became the State of Kentucky, was 61,000. 1 Marshall, Hist. Ky. 441. These people, so far removed from their seat of government, and so imperfectly protected, as was inevitable under the existing conditions, were clamorous for a separate and independent State government. On the 18th day of December, 1789, Virginia indicated by an act of her assembly the terms on which she would consent to part with her sovereignty over the new territory. This was agreed to, and is what is known as the "Virginia Compact." It was even then foreseen that conflicts would arise concerning the grants of land already made, or the initial steps of which had been begun. Perhaps the delay experienced by the Kentucky pioneers in obtaining the consent of the mother State for a separation was due to the influence of those who had taken up large boundaries of land in Kentucky for speculative purposes. At any rate the Compact abounds with evidence of the fact that controversies among claimants and settlers concerning the validity and location of these entries had already arisen in considerable numbers, and were then also foreseen as future problems. The Compact, in so far as material in this investigation, reads:

"Sec. 7. Third, that all private rights and interests of lands within the said district, derived from the laws of Virginia prior to such separation, shall remain valid and secure under the laws of the proposed State, and shall be determined by the laws now existing in this State."

"Sec. 9. Fifth, that no grant of land or land warrant to be issued by the proposed State shall interfere with any warrant heretofore issued from the land office of Virginia, which shall be located on land within the said district, now liable thereto, on or

before the first day of September, one thousand seven hundred and ninety-one.

"Sec. 10. Sixth, that the unlocated lands within the said district, which stand appropriated to individuals, or description of individuals, by the laws of this Commonwealth, for military or other services, shall be exempted from the disposition of the proposed State, and shall remain subject to be disposed of by the Commonwealth of Virginia, according to such appropriation, until the first day of May, one thousand seven hundred and ninety-two, and no longer; thereafter the residue of all lands remaining within the limits of the said district, shall be subject to the disposition of the proposed State."

"Sec. 14. And be it further enacted, that if the said convention shall approve of the erection of the said district into an independent State on the foregoing terms and conditions, they shall and may proceed to fix a day posterior to the first day of November, one thousand seven hundred and ninety-one, on which the authority of this Commonwealth, and of its laws, under the exceptions aforesaid, shall cease and determine forever over the proposed State, and the said articles become a solemn compact binding on the parties, and unalterable by either without the consent of the other."

At a convention called for the purpose of considering the proposal, the Compact was accepted by the district of Kentucky, as the new territory was then called, on July 20, 1790. An act of Congress (Act Feb. 4, 1791, c. 4, 1 Stat. 189) provided for admitting the new State into the Union, which was consummated in June, 1792. The early records of this court, and of its predecessor, the Supreme Court of the District of Kentucky (Hughes' Reports), abound in evi-

dence of the confusion into which the land titles of the young Commonwealth had fallen, even before it was launched as a State. It is easy to gather from these records that not the least of the difficulties with which the new State had to deal was the tangled condition of one of the most important features of its society, namely, the status and validity of the titles to its lands. The handicap was serious, and has been persistent. The system was loose and uncertain, admitting not only of honest mistakes, but of easy opportunities for frauds and oppression. It was peculiarly adapted to the purposes of mere speculation. The system of entering and surveying unappropriated lands was, unhappily, though not unnaturally, brought over into the new State and continued. Indeed, in the first Constitution, adopted April 16, 1792, it was provided (section 6, art. 8) : "All laws now in force in the State of Virginia, not inconsistent with this Constitution, which are of a general nature, and not local to the eastern part of that State, shall be in force in this State until they shall be altered or repealed by the Legislature." And the book of the statute laws of Kentucky for years thereafter was Littell's Statutes, compiled from the Virginia statutes and the first legislative enactments of the new State.

Provision was at once made for transferring from the records of Viriginia the evidence of grants and conveyances of lands in the old district of Kentucky. They were required to be deposited as part of the records of the office of the clerk of this court at the seat of the State government, removed a week's travel at that time from the State's eastern domain Under the existing system, and for the supposed convenience of proposed settlers, the records of new entries

and surveys were kept by the county surveyors, although it does not apear that they were required to maintain public or permanent offices at the various county seats. Many, maybe most, of the pioneer settlers of this State, were unlearned "backwoodsmen." Perhaps many of the local surveyors were but little advanced in education. Vacant lands were supposed to be plentiful. Consequently land was then the cheapest of commodities, if it might be so called. Many a noble estate, as it is now, passed then in exchange for a rifle gun or a powder flask. As new counties came to be formed, as they were rapidly enough, new county seats, with new offices and new records (without provision for transcribing the old in so far as they affected the new counties), were created, and were doubtless most generally supposed to contain all necessary data for the guidance of the settlers in taking up and conveying land. It resulted that new patents were issued for lands already appropriated by previous grants. In many instances several patents overlapped the same land. This went on with little change for nearly a hundred years. The recent and present occupants were innocent enough of knowledge or purpose, it may be safely assumed, to do ought than follow the course of the law, buying from the State in confidence, and selling among themselves with assurance that which they had bought, paid for, and at great sacrifice of labor, means, and care erected into permanent homes. It now develops, and has been known for some time, that all or most or the vast territory lying to the northwest of the Cumberland mountains, and west of the Tug Fork of Big Sandy river, to a point west of the main Kentucky river, was appropriated under entries and surveys made by virtue of the laws of Virginia before the

separation in 1792. Few of those entries were ever settled upon. So far as the new settlers knew in fact, in every probability, the lands were unappropriated. The generations of a century have thus increased, and by actual occupancy, by personal industry and thrift, and by all the means by which the Americans create a Commonwealth, they have fastened themselves to the soil in the belief that they have inherited it from their fathers, or purchased it honestly from their neighbors, and that it is theirs.

Notwithstanding that millions of acres have thus been reduced to that kind of actual possession and for such a period as to ripen into a perfect title in spite of its original state, and that the population of this territory is now more than 300,000, there are many hundred thousand acres of these lands unfenced, whose stores of mineral and mantles of forest have remained in their natural state until the present hour. Commercial necessity and enterprise in recent years are opening this region to the markets, and what was once of small value has become enormously important and valuable. The holders of these old grants during all these years have taken no part in the development of the section where these lands lie, nor done aught to add to the State's strength and stability in peace or in war. They have contributed nothing in clearing the lands for settlement. They have not tenanted them. They have not worked them. Every incentive of the government (save the pittance paid into the treasury for the warrants) which entered into the grant by the State has been withheld or disappointed by the grantees and those claiming under them. The State was then and is yet concerned in the subject of actual settlement, of homesteaders tied by interest and patriotism to the State's wel-

fare. It was from the first and is yet a proper subject
of public concern that these lands be seated by
settlers, to the end, at least, if no greater, that the
State might derive taxes from them for its support.
While the people in that section may have been un-
mindful of the underlying insecurity of their titles,
the subject has been one of constant concern to the
State. The situation was one of practical difficulties.
On the one side was the legal right of the original
patentees. On the other was the moral right of those
who had, in ignorance of the truth, bought and settled
upon some parts of these same lands. Besides it all
was the Compact with Virginia, an international
agreement in its nature, the legal effect of which,
from environment and circumstances, was little under-
stood in the State. There was the purpose to live up
to the spirit of the Compact in good faith, and fear
of its letter. Let us now follow in a brief review the
course of legislative and judicial cognizance of the
situation.

On June 26, 1792, the General Assembly of this
State (1 Litt. Laws Ky. p. 63, c. 10) enacted a statute,
by the fourteenth section (page 71) of which it was
provided that all lands of which a list shall not be
given in by the owner or proprietor to the commis-
sioner on or before February 4, 1795, and on which
taxes, with interest, should not be paid, should be
considered as, and actually be, forfeited to the State,
and should be disposed of in such manner as should
be directed by law. In 1801 the Legislature, extend-
ing the time to save forfeiture, re-enacted the for-
feiture clause. 2 Morehead & B. Ky. St. p. 1072. This
court, construing that statute in 1822, held that the
act did not, properly construed, dispense with an in-
quisition of office found, and that forfeiture was not

worked by the mere operation of the statute. Barbour v. Nelson, 1 Litt. 60. In 1812 the act known as the "Occupying Claimants Law" was adopted, which in 1823 was held unconstitutional by the Supreme Court of the United States in Green v. Biddle, 8 Wheat. 1, 5 L. Ed. 547, though by a divided court. In 1824 the act known as the "Seating and Improvement Bill" was adopted, requiring the fencing of a certain portion of each tract of 1,000 acres or more, under penalty of forfeiture. 2 Morehead & B. Ky. St. p. 1074. This act was held unconstitutional in Gaines v. Buford, 1 Dana, 481; the Chief Justice not sitting, and the two remaining judges writing divergent opinions as to the reasons upon which the court's action was based. These opinions, and that of the Supreme Court in Green v. Biddle, as well as certain resolutions of the General Assembly of Kentucky, adopted January 11, 1825 (vide Acts 1824, pp. 275-278) all indicate an unsettled state of judicial and legislative opinion as to the precise effect of the Compact as limiting the power of Kentucky in passing laws upon these subjects. On January 12, 1825, the forfeiture laws, on account of nonlisting of lands for taxation, were re-enacted, with the additional provision (doubtless moved by the court's language in Barbour v. Nelson, supra) that the forfeited title should be transferred to the Commonwealth without office found. In February, 1828 (2 Morehead & B. Ky. St. p. 1081) it was enacted that all title forfeited to the Commonwealth for failure to list property for taxation should inure to the benefit of the occupant in possession.

These latter acts were carried forward into the general revision of 1860 (2 Rev. Stats., pp. 103-106, cc. 58, 59), and by the act of 1860, (2 Rev. Stats., p.

757)-it was enacted that land forfeited prior to 1834 should remain . unredeemable. It was evidently thought by the Legislature that the provisions of the act of 1825 were valid, as they had not been questioned judicially up to that time. In the revision of 1873 (section 1, art. 17, c. 92, Ky. Stats.) the same provision was made for the forfeiture of lands not listed and tax-paid. In 1878 a case came before this court in which was involved the constitutionality of the provisions above cited relating to forfeitures without office found. Marshall v. McDaniel, 12 Bush, 378. It was there held by this court that such attempt to forfeit was unconstitutional; that the landowner must first have his day in court.

Thus the matter stood when the convention of 1890 met to revise the Constitution. This subject was deemed of enough importance to justify the creation of a special committee on "Land Titles." Various proposals were made to the convention, among others one by the member from Wolfe, Powell, Menifee, and Montgomery, embodying substantially the same provision as is contained in the act which is the subject of this opinion. The result of the deliberations of the convention was section 251 of the present Constitution. The debates show that the delegates were alive to the very evil which is herein set forth, and which we will see was presented to the Legislature in 1906 for its consideration. Section 251 of the Constitution as finally adopted reads: "No action shall be maintained for possession of any lands lying within this State, where it is necessary for the claimant to rely for his recovery on any grant or patent issued by the Commonwealth of Virginia, or by the Commonwealth of Kentucky prior to the year one thousand eight hundred and twenty, against any

person claiming such lands by possession to a well defined boundary, under a title of record unless such action shall be instituted within five years after this Constitution shall go into effect, or within five years after the occupant may take possession, but noth ing herein shall be construed to affect any right, title or interest in lands acquired by virtue of adverse possession under the laws of this Commonwealth." Doubtless the moving cause of the adoption of this provision, one of limitation, instead of the one proposed by the delegate from Wolfe, Menifee, Powell, and Montgomery, was that the Supreme Court of the United States had held that this State could legally enact a shorter limitation period than existed under the laws of Virginia in 1790 (Hawkins v. Barney, 5 Pet. [U. S.] 457, 8 L. Ed. 190—this court holding the same way in Beard v. Smith, 6 T. B. Mon. 430 ;whereas, neither court had up to that time passed upon the validity of a statute such as is now being considered. The first Legislature after the new Constitution of 1891 also attempted to help out the situation along the same line. It enacted section 2377, Ky. Stats. 1903, providing that no one should main tain an action in ejectment upon a patent issued prior to 1820 who had not paid 20 years taxes on his title. But this court in 1901, in Shaw v. Robinson, 111 Ky. 715, 64 S. W. 620, 23 Ky. Law Rep. 998, construed the language "title of record," of section 251, Const., to mean a title from the Commonwealth upon a valid patent, and denounced section 2377, Ky. Stats., 1903, supra, as unconstitutional upon the ground stated in Marshall v. McDaniel. Thus we see that from the beginning this State has been endeavoring to rid itself of the incubus caused by the dormant titles and inactive owners or claimants, who refused, or at least per-

sistently failed, to do anything toward supporting the State government, or allowing the property which they claimed to do so. We also see that, notwith-standing the public insistence and the important question of governmental policy involved, this court has from the start adhered to the strictest construction of the terms of the Compact and of the constitutional rights of the delinquents, so as to afford them every chance to come forward and save whatever title or claim they had. And yet they did nothing.

It will be remembered that in Virginia there was substantially the same state of affairs as in parts of Kentucky, for that region lying between the Allegheny mountains and the borders of Kentucky was of the same character of land, and had been appropriated by the same methods and under the same system, and at or about the same time, as had the lands in Kentucky. Naturally the same result ensued. In 1790 the Commonwealth of Virginia enacted a statute (13 Hen. Stat. at Large, p., 116, c. 5, sec. 5) by which title to lands not tax-paid for three years were "forfeited and vested in the Commonwealth." The act was extended and re-enacted in increasing vigor in 1792, 1803, and 1810. In 1835 a still more drastic act was adopted (Hutchinson on Land Titles of Virginia, p. 62), the salient features of which are incorporated in the act of Kentucky now being investigated, except that in the Virginia act there is no provision for an inquisition of office, or its equivalent, as there is in the Kentucky statute. This act has been before the Supreme Court of Appeals of Virginia a number of times, and has always been upheld as constitutional. Wild's Lessee v. Serpell, 10 Grat. 408; Staats v. Board, 10 Grat. 400; Smith v. Chapman, 10 Grat. 445, and Hale v. Branscum, 10

Grat. 418. West Virginia was erected into a State in 1863. All of her territory was carved out of old Virginia, and was wholly within the zone affected by the system of grants above discussed. In her Constitution is a provision in every feature or principle the same as the Kentucky statute of 1906, except that in the West Virginia Constitution there is not a provision for a trial in court concerning the proposed forfeiture. Article 13, sections 1-6, Const. W. Va. (Code 1906, pp. lxxxiv, lxxxv). The Supreme Court of West Virginia has also upheld the forfeiture provisions as not depriving the landowner of his property without due process of law, and as being not only just, but wise and politic, legislation. McClure v. Maitland, 24 W. Va. 561; McClure v. Mauperture, 29 W. Va. 633, 2 S. E. 761; Twiggs v. Schovallie, 4 W. Va. 463; Smith v. Tharp, 17 W. Va. 221; Hays v. Camden's Heirs, 38 W. Va. 109, 18 S. E. 461; Wiant v. Hays, 38 W. Va. 861; 18 S. E. 807, 23 L. R. A. 82; State v. Sponaugle, 45 W. Va. 420, 32 S. E. 283, 43 L. R. A. 727. The question arose in a case which was before the Supreme Court of the United States in 1898 (King v. Mullins, 171 U. S. 404, 18 Sup. Ct. 925, 43 L. Ed. 214) whether the West Virginia provision was repugnant to the federal Constitution as depriving one of his property without due process of law. The court recognized that the term "due process of law," as used in the federal Constitution, must mean the same thing throughout the Union. It also held that the term might be satisfied with a different provision for a hearing as concerned tax matters from what would be required in a controversy between individuals. The court refused to say that the provisions of the West Virginia Constitution and of the statutes of Virginia forfeiting the title

to land without office found for the nonlisting and nonpayment of taxes by their claimants was repugnant to the "due process of law" guaranty of the federal Constitution. But the court did say, as being all that was necessary to a decision of the case in hand, that inasmuch as there was a provision in the statute of West Virginia by which the lands forfeited under the Constitution of that State were sold under a decree of a court, in an action to which the former owner was made a party and in which he was allowed to redeem on certain contingencies, it was in every sense a sufficient compliance with the re quirement that the owner be given a day in which to contest the proposed forfeiture. The West Virginia provision was therefore upheld.

Thus we see that in 1906 the Legislature was confronted with this situation: Every evil that had existed from the beginning, threatening the stability of the land titles of a large and important section of the State, was still unalleviated; that every legislative measure adopted during the past 115 years had been unavailing; that in spite of their public duty, and of the imperative command of the law and needs of the State, these claimants refused to respond, and were beyond the reach of the law then in existence; that the reason of the failure of the previous legislation upon the subject was those constitutional obstacles which had been pointed out in various opinions of this court and of the Supreme Court of the United States; that similar conditions produced by the same cause had existed in two of our sister states; that they had gone further than Kentucky had in an attempt to relieve the situation; and that their efforts had been successful, and were without legal exception. The idea was not new to the Legislature that

the. duty of the Commonwealth was to protect herself from a continuation of that thrall that was paralyzing the energies of a large section of the State, disturbing its peace, and robbing the State treasury of its revenues. Thereupon article 3, p. 115, c. 22, of the Acts of 1906. was most deliberately adopted. The revenue laws of Kentucky, in the opinion of the previous Legislature, needed radical revision. A commission was raised to study the question, to hear complaints and suggestions, and to bring in at the next session a new bill covering the entire subject. Two years were allowed for the work. The committee did as directed. The whole system of the State's revenue laws was revised, and an entirely new, complete measure introduced and enacted. Acts 1906, pp. 88-248, c. 22. Article 3, as quoted above, was in this deliberate manner proposed and adopted. There can be no doubt that the Legislature determined to outlaw these dormant titles, and thereby protect the treasury and increase the State's revenues. Nor can there be doubt that the legislative purpose was to proceed carefully and in that manner that would satisfy the requirements of the Constitutions of this State and of the United States. The Legislature did not intend to deal tenderly with a situation that had been aggravating in its merits. It realized that sometimes sternness is justice, and further leniency injustice. The Legislature has squarely faced the problems of the situation. The court has no disposition to look at it otherwise than it is—to pass upon the questions of law presented, grim and bare as they may be.

Proceeding under article 3 of the act of 1906, appellant, claiming to be an owner of certain patents issued upon Virginia warrants prior to 1789, petitioned the county courts of Pike, Floyd, Knott, and Letcher to

list for taxation against it 275,235 acres of land in
Pike county, 88,215 acres in Floyd, 55,020 acres in
Letcher, and 29,058 acres in Knott, aggregating
447,528 acres. The county courts refused to list the
lands upon the ground that the petitions were not
sufficient under the statute. This feature will be
noticed particularly further along. On appeal to the
circuit courts of those counties, the same conclusion
was reached, and the appellant's applications were
refused, whereupon these appeals are prosecuted to
this court.

The first question presented is, has the court juris-
diction of the appeals? The appellate jurisdiction of
this court is regulated by statute. Only such matters
as the Legislature may see fit to allow to be brought
here on appeal are cognizable by the court. No per-
son has an inherent right of appeal, however natural
the notion that appellate courts should be open
always, as are all other courts, to a litigant who con-
ceives that his rights have been denied. But juris-
diction, and final jurisdiction, must be lodged some-
where. It has been left to the Legislature to do that.
It is exceptional, indeed, when appeals are allowed
in the matter of tax assessments. The reasons are
obvious. But they are sometimes allowed by legis-
lation. The language of the statute in question must
be looked to, to see whether an appeal to this court
is denied, in spite of the provision of the General
Statute fixing this court's appellate jurisdiction. A
clause of a section of this article provides that the
county court, "upon finding the amount, * * *
shall cause a record of the findings to be made on
the order book of the court and certified to the
Auditor. Should the court find that the land has
been assessed  *   *   *· as of any of said dates,

\* \* \* it shall accept the assessment as a basis upon which to ascertain the amount," etc. "The finding of the circuit court shall be conclusive and not subject to appeal. A copy of the findings shall be certified to the Auditor of the State, and to the clerk of the county court." Section 2, art. 3, p. 118, c. 22, Acts 1906. Under section 4241, Ky. Stats. 1903, relating to proceedings by auditor's agents to have omitted property assessed, a similar provision occurs, though not in the same language. There the finding of the lower tribunals as to the value of the property assessed is not subject to appeal, but an appeal is allowed upon the question of the liability of the property to assessment. Appeals are allowed to this court from final judgments in all cases in circuit courts where the title to land is involved, or where the amount in controversy, exclusive of interest and costs, is not less than $200. "In all other civil cases, the Court of Appeals shall have appellate jurisdiction over the final orders and judgments of all courts." Section 950 Ky. Stats. 1903. We construe the word "finding" in the act before us as relating to the fixing of the value of the property assessed. To that extent only is the appellate jurisdiction of this court, as fixed by section 950, Ky. Stats. 1903, supra, curtailed. We are of opinion that this court has jurisdiction of the appeals.

The constitutionality of the act is questioned by appellant. The question must be decided, as, if it is unconstitutional, appellant would have had the right to list its lands under other provisions of law relating to the assessment of omitted property. If it is constitutional, then, unless appellant has complied with its terms, the action of the lower court

was right. We will take up the different grounds
upon which the act is assailed:

First. It is said to be void "because it takes from
the assessor, a constitutional officer, the power con-
ferred upon him alone by the Constitution and the
laws pursuant thereto to assess all real estate." Sec-
tion 227 of the Constitution creates the office of
assessor, but does not define his duties. Section 172
of the Constitution requires all property not exempt
from taxation to be assessed at its fair cash value,
and provides for punishing "any officer or other per-
son authorized to assess values for taxation," who
shall willfully commit any error in the performance
of his duties. This seems to imply that the Legisla-
ture may provide other persons to assess property.
It has always been done that way under the present
and preceding Constitutions. Railroads, and other
public service corporations, distillers, and dealers
in rectified spirits are, and for a long time bank and
trust companies were, assessed by "other persons,"
than the county assessor. The latter cannot assess
for any period than the current year. All omitted
assessments are done by the county court, and have
been for many years, certainly ever since the adop-
tion of the present Constitution. This question was
raised in Commonwealth v. E. H. Taylor, Jr. Com-
pany, 101 Ky. 325, 19 Ky. Law Rep. 552, 41 S. W. 11.
and there decided adversely to this appellant's con-
tention.

Second. It is claimed that the act is local and
special, and thereby violates section 59 of the Consti-
tution. The only point urged in brief of counsel
under this head is that "the act could not apply at
the very outside to more than 20 or 25 counties in
Kentucky." But that does not constitute the legis-

lation either local or special. A statute regulating the care and use of natural gas wells might not apply in fact to more than a dozen counties in the State. Nevertheless the terms of the statute are general, and are applicable to every portion of the State where the conditions may exist, or may arise in the future. The classification of the subject, lands which have been omitted from assessment for a great many years, is a legitimate exercise of legislative discretion. It finds many counterparts in the statute respecting other classes of property, such, for example, as special provisions regarding the listing of nonresidents' lands and the assessment of dealers in tobacco and liquors. The act is as general as the nature of its subject will admit. That it may not apply to every county would be because the general condition treated of did not happen to exist in that county. Nevertheless the act is not thereby made local. Nor is its subject special legislation in any legal sense.

Third. It is claimed that the act violates section 171 of the Constitution, which requires that taxes shall be levied for public purposes only. The grounds of this objection are (1) that the provision for investing the occupying claimant with the forfeited title shows that he is the intended recipient of the tax; and (2) that the provisions for the sale of the other forfeited lands, and the payment of some part of the proceeds to the officers who represent the State in the prosecutions, is also a provision for their private purposes. Counsel confuse the tax levied upon the lands and the disposition of the lands by the State after they shall have become forfeited. There is no pretense, and there can be no ground for any, that the act provides any other use of the taxes that may be derived from assessments under the act than is

made of all other taxes imposed on all other property of the State and its counties. But if the assessments are not made because of the contumacy of the property holder or claimant, and thereby a forfeiture of his title results, then it is not material to him what becomes of the title which has been vested in the State. There is nothing in the Constitution which prohibits the State's conferring the title upon whom it pleases, and of disposing of it in any manner its Legislature may elect to do. The forfeiture is not a tax. Nor is it the equivalent. It is a penalty imposed for a violation of a statute. Like other penalties, it is the subject of legislative control and disposal, without regard to the previous title or ownership of the convicted violator of the law.

Fourth. It is contended that the act violates section 51 of the Constitution, which requires that every legislative act shall relate to but one subject, which shall be expressed in its title. The title to the act is "An act relating to revenue and taxation." If this article is bad for the reason last assigned, then much, if not most, of the existing revenue law of the State must fall for the same reason. A great many analogous instances might be cited from that act. But we will confine ourselves to a few. Railroads and other public service corporations are required to report certain information upon which their assessments are to be based by the State board of valuation and assessment. Their failure is penalized by fine of from $50 to $1,000 and a suspension of the corporate franchise. Similar penalties were upheld, and a like act declared constitutional, in Louisville & Jeffersonville Ferry Co. v. Commonwealth, 104 Ky. 726, 20 Ky. Law Rep. 927, 47 S. W. 877. Distillers are required to furnish certain detailed reports, under a penalty

for failure of from $100 and $500 a day. Acts 1906, p. 193, c. 22, art. 12, sec. 1, subd. 4. Liquor dealers are licensed, with elaborate procedure for obtaining license and for their revocation. In a similar statute a provision for licensing peddlers required that all notes taken by them should be indorsed, "Peddler's Note," or be void. The law was upheld as constitutional, although the question of the sufficiency of the title does not seem to have been raised. Hays v. Commonwealth, 107 Ky. 655, 21 Ky. Law Rep. 1482, 55 S. W. 425. This same act provides for a State board of equalization, their appointment, duties, and compensation; for a county board of supervisors, their appointment, duties, and compensation; and likewise for the appointment of auditor's agents. All these matters are germane to the title "Revenue and Taxation," which is the subject of the act.

The last Constitution contained a similar provision to section 51 of the present Constitution. Under it, and, indeed, since the foundation of the Commonwealth, legislation has been enacted under precisely the same or equivalent title, in which equally as wide range of treatment has been indulged as in this act. In Phillips v. Cin. & Cov. Bridge Co., 2 Metc. 19, this court, commenting on that constitutional provision, says: "It should not be so construed as to restrict legislation to such an extent as to render a different act necessary, where the whole subject-matter is connected and may be properly embraced in the same act." And further: "None of the provisions of a statute should be regarded as unconstitutional, where they all relate directly or indirectly to the same subject, have a natural connection, and not foreign to the subject expressed in its title." In L. & O. Turnpike Co. v. Ballard, 2 Met. 165, it was said: "A more lib-

eral construction of this clause of the Constitution will be not only more consistent with the objects intended to be accomplished by it, but will be found necessary in the practical business of legislation.'' Hoke v. Commonwealth, 79 Ky. 567, 3 Ky. Law Rep. 407; Chiles v. Drake, 2 Metc. 146, 74 Am. Dec. 406; Jacobs v. Louisville & Nashville R. R. Co., 10 Bush, 263; Conley v. Commonwealth, 98 Ky. 125, 10 Ky. Law Rep. 873, 32 S. W. 285; Weber v. Commonwealth, 72 S. W. 30, 24 Ky. Law Rep. 1726; Hyser v. Commonwealth, 116 Ky. 415, 76 S. W. 174, 25 Ky. Law Rep. 608; Sutherland's Stat. Constr., sec. 93; Cooley's Constitutional Limitations, sec. 145. Not only is every feature of article 3 above logically connected, but the whole naturally pertains primarily to the subject of revenue and taxation. Besides, the subject has from the beginning in this State, and prior and since in Virginia, been treated as embracing the identical features now brought forward, so that if any one concerned in such legislation, whether a member of the assembly or a landowner looking out for his interests, would naturally have expected to find such legislation under that title, and reasonably all that was germane to the subject treated under the one head.

One complaint is that the measure is really not one of revenue, but of police, and that, therefore, it is not germane to the title. There will be found in this general act many features which partake of police regulation, as well as of revenue. This is particularly true of the most of the article devoted to license, such as liquor licenses, peddlers, pawnbrokers, billiard tables, pool rooms, exhibitions of circuses, and the like. Such measures might without any impropriety have been classed under either head, as they

truly pertain to each as they are treated of. On this subject Judge Cooley (Cooley on Taxation [2d Ed.] section 587) says: "It has been seen that other considerations than those which regard the production of a revenue are admissible, and that regulation may be kept in view when revenue is the main and primary purpose. The right of any sovereignty to look beyond the immediate purpose to the general effect neither is nor can be disputed. The government has the general authority to raise revenue, and to choose the methods of doing so. It has also general authority over the regulation of relative rights, privileges, and duties, and there is no rule of reason or policy in government which can require the Legislature, when making laws with one object in view, to exclude carefully from its attention the other." The primary purpose of article 3 is to raise revenue. Its incidental purpose is to regulate other rights. Also incident is the disposal of that which, in default of the revenue sought, shall come to the State by way of penalties. As they will in such event belong to the State, to dispose of them in that way that will most redound to the public welfare, as the Legislature shall judge, is a logical continuation of the same general subject of legislation. That the Legislature has the power to so dispose of what may be forfeited to it we have no manner of doubt, nor has there been cited to us any case or advanced any reason to the contrary.

Fifth. The act is claimed to be void, as violative of the Compact with Virginia. The Compact, so far as here involved, has already been set out in the foregoing part of this opinion. As may be naturally expected, that instrument has been before this court a number of times, as well as before the Supreme Court

of the United States, for construction. It is conceded
to be as obligatory upon this State to its fair intent
as fully as if ingrafted in the Constitution of the
State. Nay, more so, in that, while the State might
alter or abrogate provisions of its own Constitution,
it is without power to either alter or ignore the Com-
pact. Green v. Biddle, 8 Wheat. 1, 5 L. Ed. 547;
Lessee of Joseph Marlatt v. Silk, 11 Pet. (U. S. 1,
9 L. Ed. 609; Poindexter v. Greenbow, 114 U. S. 271,
5 Sup. Ct. 903, 29 L. Ed. 185. Among the first
authoritative attempts on the part of this court to
construe the Compact was Boone v. Helm, 4 Dana
403, although it had been discussed, indicating the
views of certain of the judges, in Hoys' Heirs v.
McMurry, 1 Litt. 365, and in Beard v. Smith ,6 T. B.
Mon. 430..

In Boone v. Helm, this court, speaking through
Chief Justice Robertson, respecting the clauses of the
Compact now in question, said: "All these expres-
sions, taken together, mean, even according to their
literal import, this, and only this: That, as to the
validity and effect of such claims to land as then
existed under the Virginia land system for the dis-
trict of Kentucky, the rights of the claimants, as
then existing, whether perfect or inchoate, should be
tested by the laws under which they had been
acquired, and that Kentucky should not abolish those
laws, or enact and enforce any statute destructive of
the validity of such of those claims as were, according
to the laws existing when they were acquired, valid
and available. Then, if any such claimant had a good
entry, it—that is, the entry—should ever remain good
as a valid and legal location. If he had a survey,
good according to the law under which it was made,
it—that is, the survey—should continue to be held as

having been, when made, legal and valid. If he had obtained a patent, it—that is, the patent—should be deemed, in the courts of Kentucky, to have vested in the patentee all the rights which were guaranteed by the laws of Virginia existing when it was issued. And if, at the time of the separation, one claimant had a perfect and another an imperfect title to the same land, each according to its degree valid and legal, both shall ever be held, in the like manner, to have been then good, and neither of them shall ever be invalidated by Kentucky. This seems to us to be the utmost latitude of the literal and intrinsic meaning of the Compact. And it does not interdict prospective legislation by Kentucky, for perfecting any imperfect title which was good, in its degree, at the date of the Compact, or of the separation, or for maintaining her own just authority as a sovereign, in procuring revenue, giving proper repose to honest occupants, preventing vexatious litigation, or in enacting and upholding, prospectively, any other just system of public economy, which Virginia herself might have adopted without rendering by retroaction, that invalid which was valid under her laws. It is admitted in argument, and could not be plausibly denied, that prospective limitation and revenue laws, by Kentucky, affecting rights to land acquired from Virginia, are not interdicted by the Compact.''

In Kendall v. Slaughter, 1 A. K. Marsh. 378, involving the power of this State to change its limitation laws so as to give a shorter time than Virginia did at the separation for bringing actions, this court said: ''But whilst the legislative enactments of this country are by the Compact not permitted to affect the validity of those rights, we are of opinion that instrument should not be construed so as to preclude the Legisla-

ture from either regulating the mode of action, or limiting the time it should be prosecuted, for the purpose of asserting those rights. That the section alluded to was not understood by the parties to that Compact as inhibiting the Legislature from passing laws by which those rights might become forfeited is, we apprehend, apparent from other parts of that instrument; for it is furthermore in the latter clause of the eighth section provided that 'no neglect of cultivation or improvement of any land, within either the proposed State or that of Virginia, belonging to the nonresident citizens of the other, shall subject such nonresident to forfeiture or other penalty, within the term of six years,' etc. * * * If, then, notwithstanding the Compact, laws of forfeiture may be enacted, no reason is perceived why the Legislature should not be allowed to regulate the limitation of actions; for, although possession may, in process of time, ripen into a perfect right to the land, it does so, under the efficacy of the laws of limitation, operating in the nature of a forfeiture upon the failure of the claimants in not asserting the right in due time.''

These views are fully sustained by the Supreme Court of the United States in Hawkins v. Barney, 5 Pet. (U. S.) 457, 8 L. Ed. 190. This action also involved the validity of a 7-year statute of limitation passed by Kentucky, and applied to a claimant under a Virginia grant, whereas the period of limitation in Virginia applicable to such actions at the time of the separation was 20 years. That court commenting upon the Compact, said: ''It can scarcely be supposed that Kentucky would have consented to accept a limited and crippled sovereignty; nor is it doing justice to Virginia to believe that she would have wished to reduce Kentucky to a state of vassalage.

\*   \*   \*     Let the language of the Compact be literally applied, and we have the anomaly presented of a sovereign State governed by the laws of another sovereign; of one-half the territory of a sovereign State hopelessly and forever subjected to the laws of another State.  If the seventh article of the Compact can be construed so as to make the limitation act of Virginia perpetual and unrepealable in Kentucky, then I know not on what principle the same rule can be precluded from applying to laws of descent, conveyance, devise, dower, curtesy, and in fact every law applicable to real estate.  \*   \*   \*    The last member of the eighth article of this Compact distinctly recognizes the existence of the power in Kentucky to pass similar laws, notwithstanding the restriction of the seventh article, and also the probability of her resorting to the policy of such laws.''

No one seems to have thought before that the power of the sovereign State of Kentucky was, or was intended to be, curtailed by the Compact with Virginia respecting the right of the former to proceed in her own way to coerce taxes from all property within her dominion for her support.  The right to levy and collect taxes from the citizens or property within its jurisdiction is inherent in a State.  As a part of its coercive process, it may forfeit the title of recusant taxpayers, or distrain their property without judge or jury.  The Compact no more prevents the State from forfeiting the title of property whose owners refuse to list it and pay taxes upon it than it denies to this State the power to levy the taxes.  Nor does the Compact affect at all the question of procedure, jurisdiction of courts, the subsequent devolution of the title, requirements as to registry of subsequent conveyances, or the future duties and

obligations to the State of the owners of such titles. The cases examined comment upon the fact, and lay stress upon the point, that whatever Virginia herself could have done in subsequent legislation, as affecting the titles in question, Kentucky might also do. As we have seen, Virginia, at the time of the separation, had provided for a forfeiture of titles for a failure to pay the tax for three years, and has continuously since enacted such legislation. It was not a violation of the Compact for Kentucky to enact the statute in question. It does not in the least impair or affect the validity of the patents issued by Virginia or under Virginia surveys, nor does it alter the right of any holder of such patents that was acquired under the laws of Virginia. They took the patents subject to the right and power of the sovereign to compel the payment of taxes on the land in the future, and subject to the correlative power in the sovereign to forfeit the titles to the State as a penalty for the non-payment of the taxes.

Sixth. It is contended by appellant that the act in question is vicious because it seeks to extort an unlawful duplicate tax upon the same land. In the petitions of appellant is this paragraph: "Your petitioner is advised by counsel, learned in the law, and believes, that in all of said years, and now, under the laws of the Commonwealth of Kentucky, whenever the occupant or occupants of any part or parts of any of said tracts have paid the taxes thereon, which those under whom your petitioner claims ought to have paid or ought to pay, the person so paying the tax shall be entitled to recover of the owner the amount of the tax so paid and interest, which shall continue a lien on the property upon which such tax was paid." The laws of the Commonwealth referred to in the

foregoing statement of the petitions are as follows: "Any person having a lien on property upon which the owner has failed to pay the taxes, and has become delinquent, such lien holder may pay the taxes, interest and penalties thereon, and shall be subrogated to the lien of the Commonwealth, county or district therefor, and the sum so paid shall bear legal interest from the date of payment, and shall be collectible in the same manner as the original claim of the lien holder." "Wherever the occupant or tenant of any land, or bailee or person in possession of any personal property, shall pay the tax thereon which the owner ought to pay, the person paying the tax shall be entitled to recover of the owner the amount of the tax so paid and interest, which shall constitute a lien on the property upon which such tax was paid." Ky. Stats. 1903, sections 4032, 4033, continued in force by Act March 15, 1906, article 1, sections 14, 15, and Acts 1906, p. 92, c. 22.

There is no such connection or privity between adverse claimants of land as entitles one to recover taxes voluntarily paid by him on the land, although he in fact did not own it, from another who did own it, but failed to list it and pay the taxes. That which the State taxes is the property of the claimant—not the land. The right to possess, the title or legal title of dominion, is the property which the law protects, and is that property which it taxes. If two persons claim the same land, each having a title, but undetermined which is superior, shall the State stand back until their dispute is settled before it can exact a tax from the owners? For if one of them can lawfully refuse to list his claim, which is his estate in the land, then the other could also. The State creates property—that is, the right to a thing—by protecting

its use and enjoyment. It maintains police to pro-. tect its security and that of its owner, courts in which his rights may be vindicated, and the whole fabric of social government, which gives all value to every kind of property. In return, the State exacts certain personal services from the citizen, and in addition a sum at certain intervals, called a "tax," with which to defray the expenses of the government which he enjoys and which protects him in his rights óf property. The State, then, may tax whatever is property within its jurisdiction. If one has an imperfect title to land, that is property, and it may be taxed. although another have a more perfect claim to the same land, which is also taxed as his property. That is not double taxation. There are many instances in which the same tangible thing supports several separate properties. For example, a corporate franchise is taxed; so is the property which is used in connection with it, and without which the franchise would have no appreciable value. Lands owned by corporations may be taxed; that is, the corporation's dominion and right in them. Based upon the land, the corporation issued shares to its stockholders. These shares, mere intangible things, may also be taxed against the shareholders. Nor would that be double taxation, though it might be impolitic. A debt is taxable as the property of the creditor. That for which the debt was created, if property, is also taxed as the property of the debtor.

The act of 1906 provides: "It shall be the duty of each and every owner or claimant of land to pay all the taxes    *    *    *    and to list said land    *    *    * for taxation." It also provides: "The fact that said land has been listed for taxation, or the taxes have been paid thereon by another claimant, shall not

relieve against the duty therein imposed.'' Laws 1906, pp. 115, 116, c. 22, art. 3, section 1. The provision existed under the General Statutes. Gen. Stats. p. 1036, c. 92, art. 1, section 8. Double taxation is not per se unconstitutional. It is only when taxes are imposed twice by the same government upon the same property as against the same owner that they are inhibited, and then only by virtue of the clause in the Constitution which requires all taxation to be uniform. It is only when there is a destruction of uniformity by virtue of the so-called double taxation that it is prohibited. The State is interested, not only in having its taxes paid to it, but in having them paid by the persons who ought to pay them. The fact that the State makes a claimant in possession, though not having the best title, pay taxes upon his property— that is, his claim—does not exhaust the State's power to compel any other claimant of a title to the same land to list his claim and pay taxes upon it. The statutes quoted above, and relied on by appellant, at the utmost would not give a claimant of land who paid taxes on it a lien as against the true owner, if the latter also paid. When the Legislature requires the true owner to list and to pay taxes on his claim, it is therefore no defense under this statute that another (a stranger to the title) has listed the land and paid the taxes, and would have a right of action to recover for them if the State did not collect them from the true owner. Simpson v. Edmiston, 23 W. Va. 675.

Seventh.  The act is claimed to infringe both the federal and State Constitutions, in that it attempts, so it is argued for appellant, to deprive citizens of their property without due process of law. This proposition involves the power of the State to forfeit lands of the owner or claimant because he failed to

list or pay taxes on them.    The power of the State to levy the tax is not to be questioned.    No more is its power to coerce its payment.    As listing the property for assessment is a necessary step towards collecting the tax, the State must have as ample power to compel that step as any other in the process of collecting the tax, or its whole power in the premises is reduced to the strength of the weakest incident. It is no longer controverted that the State may distrain the delinquent's property—may sell it by the most summary proceeding.    No judicial action is necessary to perfect the title.    ''In what important particular does this differ from the case of forfeitures,'' says Judge Cooley in his work on Taxation (page 464), ''except that to the proceedings which are to work the forfeiture there is added the one requirement of a public sale?    But there are in the sale no elements of an adjudication.    It does not stand in the place of one.    Its purpose is only to bring to the public treasury the tax for which the sale is made.    Incidentally in the proceedings a purpose is kept in view not to sacrifice any further than shall be necessary the interests of the owner; and to this end notice of the sale is required, with a view to invite competition among bidders.    But we are not aware of any constitutional principle that entitles a party to have his duty coerced by a public sale of property rather than by a forfeiture of it.    A sale by a ministerial officer, which, as the closing step in administrative action, is to divest the owner of his title, is as much obnoxious to the charge that it deprives him of his freehold without a hearing, as is the legislative forfeiture.''

That text was written before the opinion of the Supreme Court in King v. Mullins, supra, in which,

in summing up on the West Virginia Constitution and statutes already noticed, the court said: "We hold that the system established by West Virginia, under which lands liable to taxation are forfeited to the State by reason of the owner not having them placed or caused to be placed, during five consecutive years, on the proper land books for taxation, and caused himself to be charged with the taxes thereon, and under which, on petition required to be filed by the representative of the State in the proper circuit court, such lands are sold for the benefit of the school fund, with liberty to the owner, upon due notice of the proceeding, to intervene by petition and secure a redemption of his lands from the forfeiture declared by paying the taxes and charges due upon them, is not inconsistent with the due process of law required by the Constitution of the United States or the Constitution of the State." This court, in Marshall v. McDaniel, 12 Bush, at page 383, said that it was within the power of the State to provide for a forfeiture of the owner's title if he should fail to list or pay taxes on his land; but it was held in that case that before the forfeiture could become effective he must have an opportunity to be heard in the matter before some competent tribunal to try the question—not whether it was right that his title should be forfeited, but whether the facts existed which under the statute worked a forfeiture. So in Harris v. Wood, 6 T. B. Mon. 643, this court held that the State was not required, in collecting its taxes, to submit the question of right or of the taxpayer's liability to a judicial tribunal or to a jury; that such had never been the law of the land. Under the act here involved, the owner is given a day in court. His title does not become forfeited till it is so adjudged in an action

in the circuit court, to which he is made a party, and is summoned if within the court's jurisdiction, or proceeded against regularly by publication otherwise, and a regular trial is or may be had. The inquiry would be, in the trial, did he fail to list or pay the taxes within the time and in the manner prescribed by the statute? If he did fail, then the judgment will carry into effect the legislative fiat that his title shall be forfeited to the State. If he did not fail, then the proceeding to forfeit will be dismissed, and he will be left with his title as it was before.

In this connection we will notice another objection made against the statute, which is that it is an ex post facto law; that it punishes an act or omission by forfeiture of property which, when the act was omitted, was not so punishable by law. But such is not the fact. It is not the failure to list in the years 1901, 1902, 1903, 1904, and 1905 that works the forfeiture; but it is the failure after the passage of the act in 1906 to thereafter list the property for the five years named, and before January 1, 1907. It was within the power of the Legislature to forfeit for even one year's omission.

Eighth. It is assumed in argument against the validity of the act that any retrospective statute is unconstitutional. But such is not the law. The Legislature may provide for retrospective assessment of property, and, if it has been omitted, ought to do so (Levy v. City of Louisville, 97 Ky. 394, 30 S. W. 973, 16 Ky. Law Rep. 872, 28 L. R. A. 480), as otherwise such property would enjoy an exemption to which it was not entitled, and thereby impose an additional and unjust burden upon other taxpayers. There is nothing in our Constitution which prohibits retrospective taxation. Nor is there in the federal

Constitution. Florida Central R. R. Co. v. Reynolds, 183 U. S. 471, 22 Sup. Ct. 176, 46 L. Ed. 283. The only inquiry is, has the Legislature clearly indicated its purpose to tax the property retrospectively? Durrett v. Davidson, 93 S. W. 25, 8 L. R. A. (N. S.) 540, 20 Ky. Law Rep. 401. Under the language of this act there can be no doubt of such purpose.

Ninth. There are a number of other objections made to the statute by appellant, all of which may be grouped under the general complaint that it is harsh, oppressive, and unjust. Were these objections well grounded, they would afford no basis for relief at the hands of the court. The policy of the Legislature may be looked into by the courts for the purpose only of interpreting statutes. If, then, they are found to be within the power of the Legislature to enact, the business of the court is ended. That the Legislature saw proper to enact a harsher remedy than it might have done; that it allowed the minimum of grace to the taxpayer; that it imposed most onerous penalties for his defaults; that it imposed even greater penalties than it does as against other classes whose fault may be no greater; that it does not even excuse infants, or married women, or persons laboring under disability, when the general policy of legislation is to deal more indulgently with those classes— are all considerations of expediency which appeal to the good sense and the conscience of the legislators. It is not tolerable in our form of government, with its distinct separation of powers, that acts of the legislative branch should stand or fall according as they appealed to the approval of the judiciary; else one branch of government, and that the most representative of the people, would be destroyed, or at least completely subverted to the judges. We do not say

that this act is to be regarded, in the light of the history of its enactment and the abuses it was intended to remedy, as falling within the category described. There is abundant basis for the act, in which it will appear, not only as reasonable, but as highly politic. All that we do mean to say is that, tested by precedent and principle, we are unable to find that it violates any provision of the Constitution of the United States or of this State, or in any wise transcends the power of the legislative department of the State government.

Finally. Did appellant comply with the statute, so that the county court ought to have listed the lands? The petitions in these cases contained the same averment, of which the Pike county case is selected as a sample, as follows: "You petitioner claims to be an owner of the herein below described tracts of land, situated in the county of Pike, State of Kentucky, but not of the improvements thereon, nor of the surface of certain parts of each tract as hereinafter stated, to-wit." Then follows a description of land by calls and distances, which it may be assumed were sufficiently explicit to have located the several boundaries. The petition sets out the dates of issue and serial numbers of the patents, and the instruments through which the petitioner derived title, namely, unrecorded deeds from Charles B. Hillhouse, and that the title of Hillhouse was derived by deeds and contracts to convey made by him with "others claiming by inheritance, by divers mesne conveyances, from those to whom said tracts of land respectively were granted by letters patent." The petition then states that the lands had not been assessed for any of the years 1901 to 1905, both inclusive, either by the petitioner or by any one under whom it derived title, and

that no part of the taxes for any of those years had been paid. But the petitions alleged that parts of each of said tracts had been listed for taxation for each of said years by others than the plaintiff and those under whom it claimed, and that taxes under this listing have been paid by strangers. The petition then continues: "Your petitioner does not claim to be the owner of any improvements on any of said tracts of land, nor of so much of the surface of said lands as has been adversely held by others for a period sufficient to toll your petitioner's right of entry."

The defects of these petitions are: (1) They do not disclose the names of the owners, and therefore do not show the proper persons to be assessed. They show that appellant is only "an owner." Of what part, or in what proportions, and by whom the remaining portions are owned, is not shown. (2) They do not "so describe the land proposed to be assessed" as that, in the language of the statute, "it can be identified"—the land to be assessed in not only specific tracts, so described in their entirety as to be susceptible of accurate location, but the interest of the listing owner, if he owns less than the entire tract, must be so described as that it may be identified. (3) Some of the patent boundaries described lie only partly in the county wherein it is proposed to list it. The petitions show that fact, but do not show where, in what part of the county, the parts to be assessed do lie; nor do they show where the excluded parts which it is admitted do not belong to the petitioner lie, so as that the court could with reasonable certainty and intelligence fix a valuation upon that part which is assessed. For lands which lay upon the main Big Sandy river, in Pike county, would have

a much greater cash value than if they lay across a mountain range miles away from a navigable river or a railroad. If the claimant does not own the whole tract described, he must show what portion he does own or claim. A failure to so describe exclusions as that they may be identified leaves the description as indefinite as if the original tract could not be identified.

Nor are these objections merely technical, interposed whimsically, so as to defeat the proposed listing of the land, and so as to work its forfeiture. They are each substantial, and have solid merit to support them. Only the title of the person assesed passes by a tax sale. Johnson v. McIntyre, 1 Bibb, 295. If lands are assessed in the name of the wrong persons, no title passes by the tax sale. Wheeler v. Brammel, 8 S. W. 199, 10 Ky. Law Rep. 301; Spalding v. Thompson, 30 S. W. 20, 16 Ky. Law Rep. 836. The listing of partnership property in the name of an individual member of the firm is invalid to pass the partnership property under tax sale. Furguson v. Clark, 52 S. W. 964, 21 Ky. Law Rep. 697. A tax deed for 100 acres of 600 acres was held void in Humphries v. Huffman, 33 Ohio St. 395. The description in the deed must be one that identifies the land with reasonable certainty. Cooley on Taxation, 516; Gooch v. Benge, 90 Ky. 393, 12 Ky. Law Rep. 368, 14 S. W. 375. In the last-named case it was held that the description in the sheriff's deed must be so accurate as to "enable the officer selling it and those disposed to purchase to find it and ascertain the character of it by the description given." The description in the deed and the assessment roll must agree, or the title fails to pass. Carlisle v. Cassidy, 20 Ky. Law Rep. 562, 46 S. W. 490. A sale for taxes that

have been paid is void. Therefore it is of the first consequence that the assessment should be such as that, if the lands were sold under it, the title of the taxpayer would pass; otherwise, no one would be justified in bidding at the sale, and the State would get none of its taxes in spite of its efforts. Furthermore, if the taxpayer did not pay within the time fixed in the statute, and the State or county elected to forfeit his title, if the assessment was ineffectual, the proceding to forfeit must fall by the way. As the nonresident may not be reached otherwise for the tax than by the proceeding in rem, it is competent and necessary for the State to have in the first instance such an adequate list as will satisfy every requirement of the law as to passing a valid title if a sale or forfeiture of the land should be necessary to realize the tax.    Commonwealth v. Tobacco Company, 107 Ky. 1, 21 Ky. Law Rep. 573, 52 S. W. 799. The purpose of the Legislature was to enforce, under the extreme penalty of forfeiture for failure, such a listing of the property as would in the future prevent its escape from taxation, as it had been enabled to do in the past because of statutes so loosely drawn as that no title would pass in case of default; and as the owner was a nonresident, or might be, a penalty of a fine would be wholly inadequate to secure the listing, as, owing to his absence from the State, jurisdiction could not be obtained to assess the fine in a criminal or penal action. An assessment under the offer made by appellant would not have enabled the State to sell any particular piece of land, or any particular interest in any particular parcel, so as to pass the title of appellant and the others claiming with it. The petition was so vague and indefinite as to utterly fail to meet the requirements of the statute. It does

not answer to say that the taxpayer did not know his
property or its description. He is required to know
it, and to furnish it, so as the property may be cer-
tainly identified from it; nor is it an answer to say
that it would be too expensive for him to make the
necessary investigation.

Wherefore we conclude that the county courts were
right in refusing the lists, and the circuit courts' judg-
ments so holding are each affirmed.

DISSENTING OPINION BY JUDGE HOBSON—

When an act is not punishable under the law in
existence when it is done, it cannot be made punish-
able by the Legislature by a law subsequently passed;
and, upon like principles, where an act is punishable
in a certain way when it is done, the Legislature can-
not by a subsequent law add to the punishment or
penalty. The Legislature cannot deny to any one the
equal protection of the laws; and in my judgment
article 3 of the revenue act of 1906 (Acts 1906, p.
88, c. 22) is void, both on the ground that it is ex
post facto legislation, and that it denies to the hold-
ers of land titles referred to, the equal protection of
the laws.

The act was approved March 15, 1906. It took
effect about 90 days thereafter. The first section
of the act makes the duty of every owner or claimant
of land to pay all the taxes which had been assessed
or should have been assessed against him, or those
under whom he claims, as of the 15th day of Sep-
tember, 1901, 1902, 1903, 1904, and 1905; and, if it
had not been assessed for any of these years, the
act made it his duty to assess the land and pay the
taxes, interest, and penalty therein provided for. His

failure to do this is made a cause for the forfeiture
of his title; but this forfeiture shall be extinguished
if on or before March 1, 1907, he lists the land and
pays the taxes, with the interest and penalties pro-
vided by law in case of the redemption of land sold
for the nonpayment of taxes. When land is sold for
the nonpayment of taxes, a penalty of 15 per cent.
is added, and the taxes bear interest at the rate of
10 per cent. So that the meaning of the act is that
the owner of land who had failed to list it for the
years named must list it after the act takes effect and
pay a penalty of 15 per cent., and also interest on
the taxes at 10 per cent. per annum from the time he
was delinquent; that is, from the time the land should
have been assessed. By the law in force up to the
time this act took effect the owner of land which had
been omitted from assessment might voluntarily have
it assessed at any time and pay taxes, without interest
or penalties. If he failed to list it voluntarily, and a
proceeding was instituted against him under section
4241 of the Kentucky Statutes of 1903, he was liable
to a penalty of 20 per cent., which went to the officer
instituting the proceeding; but, even in this case, he
was not liable for interest at 10 per cent. on the taxes,
and if he made the assessment voluntarily, without a
proceeding being instituted against him, he was not
liable for the penalty of 20 per cent. While the act
gives him until March 1, 1907, to list his property
and pay the taxes, from the moment the act took
effect the only way that he could escape the forfeiture
of his title was to pay not only the taxes, but the
interest and penalty. The act does not give him a cer-
tain length of time to list his propery, and provide
that if he fails to list within that time he shall be
subject to the penalty; but it imposed the penalty

upon all who are delinquent in listing their land and who would escape the forfeiture of their title by listing it after the act takes effect.

It is said that so much of the act as imposes the penalty for the past delinquency may be rejected, and that the balance of the act may stand; but this is not a case in which that rule can be applied, for the reason that the act forfeits the title of all persons who had failed to list their land for the years named, and the only way in which they can escape the forfeiture is by paying the taxes, with interest and penalty. If they do not pay the taxes, interest, and penalty, the forfeiture stands. If that part of the act which provides for the extinguishment of the forfeiture is invalid, then there is no way in which the owner can escape the forfeiture. Besides, this is an essential part of the whole scheme of the act, and it cannot be presumed that the Legislature would have passed the act without this. The forfeiture of the titles of the owners is the purpose of the act. There would not be a clearer case of legislative intention to punish retrospectively. By the general law the person owning land at the time it should be assessed is not only liable for the taxes, but remains bound therefor; by this article the present owner's land is forfeited to the Commonwealth for the nonpayment of taxes by the former owner. By the general law, if the occupant of land pays the taxes thereon, he is entitled to recover of the owner the amount so paid, with interest, and has a lien on the land therefor; by this article the fact that the land has been listed for taxation and the taxes paid by the occupant does not prevent the forfeiture as therein set out. By the general law land may be assessed retrospectively at any time not later than five years, but not to prejudice the rights

of purchasers acquired in the meantime; by this article the purchaser is required to pay the taxes, with interest and penalty. By the general law, if the owner sells the land after the 1st of February of the year in which the taxes are due and payable, it is the duty of the owner to pay the taxes; by this article the purchaser's title is forfeited if he does not pay them. By the general law, where property has been sold for taxes, the owner may redeem it within two years; by this article the owner forfeits his title to the land if he fails to assess it and pay the taxes thereon as therein provided. By the general law, if the owner fails to assess his property, it may be assessed retrospectively, but the taxes are then collected as other taxes; by this article the taxes are not collected as other taxes, but must be paid at once, with interest and penalties, to avoid a forfeiture of the title. By section 4 of this article, before the defendant may redeem, he must pay, not only the amount of unpaid taxes charged, but those that ought to have been charged against those under whom he claims for 50 years preceding the filing of the counter-claim. No such provision is found in the general law relating to other property, and there is no provision in the general law for double taxation of the same property, and the payment of the taxes by each claimant where there are two claimants to it.

A reading of the article shows that it was a deliberate attempt on the part of the Legislature to deny the equal protection of the laws to the owners of the land titles referred to, and to provide as to the holders of these land titles an entirely different system from that provided for the holders of other species of property. It is therefor, in my judgment, void

both under the Constitution of this State and the Constitution of the United States.

For these reasons, I dissent from the opinion of the court.